**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| TABERNA PREFERRED FUNDING IV, LTD., | Case No. 17-11628 (MKV) |
| Alleged Debtor. | |

DECISION DENYING MOTION
FOR PARTIAL SUMMARY JUDGMENT

APPEARANCES:

KLEE, TUCHIN, BOGDANOFF & STERN LLP
*Counsel for the Petitioning Creditors*
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
By: Robert J. Pfister, Esq.
Whitman L. Holt, Esq.

PEPPER HAMILTON LLP
*Counsel for Hildene Opportunities Master Fund II, Ltd.*
620 Eighth Avenue, 37th Floor
New York, New York 10017
By: H. Peter Haveles, Jr., Esq.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Counsel for Hildene Opportunities Master Fund II, Ltd.*
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
By: Eric D. Winston, Esq.

51 Madison Avenue, 22nd Floor
New York, New York 10010
By: Lindsay M. Webber, Esq.

DAVIS POLK
*Counsel for Citigroup Global Markets, Inc.*
450 Lexington Avenue
New York, New York 10017
By: Elliot Moskowits, Esq.
Brian M. Resnick, Esq.

1

Justin Sommers, Esq.

MARKO & MAGOLNICK, P.A.
*Counsel for Investors Trust Assurance, SPC*
3001 South West 3rd Avenue
Miami, Florida 33129
By: Joel S. Magolnick, Esq.

KASOWITZ BENSON TORRES LLP
*Counsel for Waterfall Asset Management, LLC*
1633 Broadway
New York, New York 10019
By: Matthew B. Stein, Esq.
Michael A. Hanin, Esq.

MILBANK, TWEED, HADLEY & MCCLOY LLP
*Counsel for TP Management LLC*
28 Liberty Street
New York, New York 10005
By: Gerard Uzzi, Esq.
Daniel M. Perry, Esq.
Alexander B. Lees, Esq.

**MARY KAY VYSKOCIL**
**UNITED STATES BANKRUPTCY JUDGE**

On June 12, 2017 (the "Petition Date"), Opportunities II Ltd., HH HoldCo Co-Investment Fund, L.P., and Real Estate Opps Ltd. (collectively, the "Petitioning Creditors") filed an involuntary chapter 11 petition (the "Involuntary Petition") against Taberna Preferred Funding IV, Ltd. ("Taberna"), a structured-finance entity known as a collateralized debt obligation or a "CDO." In 2005, Taberna issued eleven classes of notes that descend in priority (collectively, the "Notes") in exchange for cash, and used the funds generated by the issuance to purchase securities issued by third parties. The purchased securities were intended to generate proceeds to repay the Notes and serve as collateral securing the Notes (collectively, the "Collateral"). The Petitioning Creditors hold 100% of the most senior class of Notes (the "A-1 Notes") and approximately 34% of the second-priority Class A-2 Notes (the "A-2 Notes"). Several holders

2

of Notes that are junior in priority to the A-1 and A-2 Notes, along with the collateral manager, oppose the Involuntary Petition.

Faced with competing demands from the Petitioning Creditors and various holders of Notes that are junior to the A-1 and A-2 Notes (collectively, the "Noteholder Defendants"), who had demanded that Taberna move to dismiss the Involuntary Petition, Taberna filed an interpleader complaint (the "Interpleader Complaint"), requesting that the Court order the Noteholder Defendants and the Petitioning Creditors to interplead their claims as to the propriety of the Involuntary Petition. *Interpleader Complaint*, Adv. Proc. No. 17-01087. The Noteholder Defendants include KL Fund II ("KL Fund"), Hildene Opportunities Master Fund II, Ltd. ("Hildene"), Waterfall Asset Management LLC ("Waterfall"), Investors Trust Assurance SPC ("ITA") and Citigroup Global Markets Inc. ("Citibank"). Thereafter, Hildene, Waterfall, ITA, Citibank and EJF Capital LLC (together, the "Junior Noteholders"), Taberna, the Petitioning Creditors, and TP Management LLC, as collateral manager ("TP Management") entered into a stipulation, which was so ordered by the Court, with respect to the conduct of further proceedings relating to the Involuntary Petition and the Interpleader Complaint (the "Stipulation"). [ECF No. 45] Pursuant to the Stipulation, the parties agreed to hold the Interpleader Complaint in abeyance pending a trial, at which the parties agreed they would address all issues, objections, responses and defenses that the parties wish to raise in connection with the Involuntary Petition. The parties acknowledged in the Stipulation that no party was waiving a right to move for summary judgment on any such issues in advance of the trial. The parties then engaged in discovery and submitted briefs in support of their respective positions to be addressed at the trial.

Before the trial, the Petitioning Creditors moved for partial summary judgment seeking a ruling that they hold unsecured claims against Taberna, making them eligible to be petitioning creditors under section 303(b) of the Bankruptcy Code (the "Motion" or "Mtn"). *Petitioning Creditors' Motion for Partial Summary Judgment* [ECF No. 51]. The Junior Noteholders[1] and TP Management (together, the "Objecting Parties") oppose the Motion and contend that the Petitioning Creditors are not entitled to summary judgment because the Petitioning Creditors hold oversecured, non-recourse claims on account of the Notes. *Opposition to Petitioning Creditors' Motion for Partial Summary Judgment* (the "Opposition" or "Opp.") [ECF No. 65][2] Thus, the issue before the Court on the Motion is whether the Petitioning Creditors are entitled to judgment as a matter of law that they hold undersecured claims against Taberna, such that they are qualifying creditors under section 303.

*BACKGROUND*

Pursuant to an indenture dated December 23, 2005 (the "Indenture"), Taberna issued eleven classes of Notes in the aggregate principal amount of $630,175,000. *See Petitioning Creditors' Statement of Undisputed Facts in Support of their Motion for Partial Summary Judgment* (the "PC SOF") ¶ 2 [ECF No. 52]; Opp. ¶ 1. Under the terms of the Indenture, the

---

[1] The Junior Noteholders collectively hold in excess of $85 million in principal amount of the Notes. *See* Opp. ¶ 3.

[2] Notwithstanding the plain terms of the Stipulation, the Petitioning Creditors asserted, for the first time in the *Reply Brief in Further Support of the Petitioning Creditors' Motion for Partial Summary Judgment* [ECF No. 72] (the "Reply Brief" or "Reply Brf.") that the Objecting parties lack standing to oppose the Motion because, pursuant to Code section 303(d), only the alleged debtor may file an answer to the petition and pursuant to Rule 1011(e) of the Federal Rules of Bankruptcy Procedure, no other pleadings shall be permitted. (Reply Brf. ¶¶ 4, 7-10) At the hearing on the Motion, Taberna's counsel stated on the record that, to the extent necessary, Taberna joined in the Objecting Parties' Opposition, and that they did not file a formal joinder because they thought the Stipulation allowed for the Objecting Parties to address all issues concerning the Involuntary Petition. *See Transcript of Hearing Held on September 28, 2017* ("Hr'g Tr.") 57:20–58:10. Counsel to the Petitioning Creditors stated that they were not asking the Court to rule on standing in connection with the Motion. *See Hr'g Tr.* at 113:6-7. Accordingly, the Court will not address herein the issue of standing raised in the Reply Brief.

Collateral[3] is held in trust for the benefit and security of, *inter alia*, holders of Notes (*i.e.* the "Noteholders"). For example, the Granting Clauses of the Indenture provide, in relevant part, as follows:

> *The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties*, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all accounts, general intangibles, chattel paper, instruments, securities, investment property and any and all other property (other than Excepted Property) of any type or nature owned by it, including (a) the Collateral Debt Securities and Equity Securities (listed, as of the Closing Date, in the Schedule of Collateral Debt Securities) which the Issuer causes to be delivered to the Trustee (directly or through a Securities Intermediary) herewith, all payments thereon or with respect thereto, all Collateral Debt Securities and Equity Securities which are delivered to the Trustee (directly or through a Securities Intermediary) after the Closing Date pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Accounts, Eligible Investments purchased with funds on deposit in said Accounts and all income from the investment of funds therein, (c) the Collateral Management Agreement, the Hedge Agreements and the Hedge Collateral (if any), and the Collateral Administration Agreement, (d) all Cash and Money delivered to the Trustee (directly or through a Securities Intermediary) and (e) all proceeds, accessions, profits, income benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses (*collectively, the "Collateral"*). *Such Grants are made, however, in trust, to secure the Notes and the Combination Notes equally and ratably without prejudice, priority or distinction between any Note and any other Note by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, and to secure (i) the payment of all amounts due on the Notes and the Combination Notes in accordance with their respective terms,* (ii) the payment of all other sums payable under this Indenture (including the Collateral Management Fee and all amounts payable to the Collateral Manager under this Indenture and the Collateral Management Agreement), (iii) the payment of all amounts due from the Issuer to the Hedge Counterparty under the Hedge Agreements in accordance with their respective terms and (iv) compliance with the provisions of this Indenture and the Hedge Agreements, all as provided in this Indenture and the Hedge Agreements (*collectively, the "Secured Obligations"*).
>
> . . .
>
> Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable

---

[3] The Collateral consists mostly of long-term securities issued by real estate investment trusts and other real estate entities. *See Petitioning Creditors' Statement About the Involuntary Chapter 11 Petition Regarding Taberna Preferred Funding IV. Ltd.* (the "PC Stmt") ¶ 10 [ECF No. 2]; Opp. Brf. ¶ 2.

> to agreements made and to be performed therein.  Upon the occurrence of any Event of Default with respect to the Notes, and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Secured Parties, or otherwise available at law or in equity, *the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein* and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public or private sale.
>
> The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein to the best of its ability such that the interests of the Secured Parties may be adequately and effectively protected.

SOF, Exh. A at 1-3 (emphasis added).  The Secured Parties are defined to include the Noteholders.  *See id.* at 1, 44.  In addition, Section 5.5 of the Indenture provides that if an event of default has occurred and is continuing while the Notes are outstanding, "the Trustee shall retain the Collateral securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral securing the Notes in accordance with the Priority of Payments," unless the Trustee determines that the anticipated proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full various outstanding amounts due in accordance with the Indenture or if a specified percentage of a supermajority of Noteholders direct the sale and liquidation of the Collateral.  *See id.* §§ 5.5(a)(i), (ii).

In August 2009, an event of default occurred under the Indenture, and the indenture trustee (the "<u>Trustee</u>") accelerated the Notes the following month.  *See* PC Stmt ¶¶ 17, 18.

6

*DISCUSSION*

Section 303 of the Bankruptcy Code governs the commencement of involuntary bankruptcy cases. Pursuant to section 303(b)(1), an involuntary case may be commenced

> by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

11 U.S.C. § 303(b)(1). Thus, in order to commence an involuntary case against Taberna, the Petitioning Creditors must hold claims that aggregate $15,775 in unsecured amount. *See* 11 U.S.C. § 303(b); *see also CC Britain Equities, LLC v. Allen-Main Assocs. Ltd. P'ship (In re Allen-Main Assocs. Ltd. P'ship)*, 223 B.R. 59, 61 (B.A.P. 2d Cir. 1998).

In their Motion, the Petitioning Creditors seek a ruling that they collectively hold unsecured claims against Taberna totaling at least $15,775. It is undisputed that, as set forth in the Granting Clauses of the Indenture, quoted above, all of the Notes are secured by a single lien granted to the Trustee for the benefit of all Noteholders. Thus, the Petitioning Creditors hold *secured* debt. Notwithstanding this, the Petitioning Creditors advance two alternative arguments as to why they nonetheless are entitled to judgment as a matter of law that they hold *unsecured* claims against Taberna. The first argument is that Petitioning Creditors may waive their beneficiary rights to the Collateral and thereby relinquish their secured status to become holders of undersecured claims against Taberna. In response, the Objecting Parties contend that the Petitioning Creditors cannot waive their secured status because the Trustee (not the Petitioning Creditors) holds the underlying lien on the Collateral. Moreover, the Objecting Parties contend that even if the waivers effectively change the Petitioning Creditors' secured claims to

7

undersecured claims in the amount required under section 303(b), such waiver would do nothing more than constitute a relinquishment of rights to benefit from the Collateral. In addition, according to the Objecting Parties, the waivers would not give rise to unsecured claims against Taberna because the Notes are non-recourse, and the Petitioning Creditors' claims with respect to the Notes are only against the Collateral.

The Petitioning Creditors' other argument, referred to as the "common lien argument" by the parties, is that because the Notes are secured by a single lien on common collateral, the Court need only compare the aggregate outstanding amount owing on all of the Notes to the value of the Collateral to determine the secured status of the Petitioning Creditors. *See* Mtn. ¶¶ 22 - 26. Thus, the Petitioning Creditors argue that the Court must conclude that the Notes are undersecured because, as of the Petition Date, the amount owing on all of the Notes exceeded the total value of the Collateral. *See* Mtn. ¶¶ 23, 26. The Objecting Parties contend that this argument fails for a number of reasons. First, according to the Objecting Parties, if there is only one lien, there can only be one claim, and the Trustee, as the holder of the lien, holds that claim. *See* Opp. ¶ 46. The Objecting Parties also argue[4] that the Petitioning Creditors have failed to show that the claims they hold (totaling approximately $154 million) exceed the total value of the Collateral. *See* Opp. ¶ 46.

---

[4] The Objecting Parties argue that the Petitioning Creditors cannot be entitled to a judgment that they are eligible petitioning creditors because the Indenture expressly prohibits the Petitioning Creditors from filing an involuntary petition against Taberna under the circumstances. *See* Opp. ¶ 47. While the parties disagree over whether the various clauses contained in the Indenture that are relevant to this point prohibit the Petitioning Creditors from commencing an involuntary case against Taberna, this issue is not relevant to a determination of the secured status of the Petitioning Creditors' claims – the issue framed by the Motion, and will therefore be addressed at the upcoming trial.

8

**A.     Summary Judgment Standard**

Summary judgment under Rule 56 may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. *See Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). A party is not entitled to summary judgment if it "fails to . . . establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Thus, the Court must ask whether "the record, taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In considering a motion for summary judgment, a court is require to resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-159 (1970).

**B.     The Partial Waivers**

The Petitioning Creditors acknowledge that the Indenture provides for one lien, granted to the Trustee for the collective benefit of all Noteholders, and that the A-1 and A-2 Notes they hold (together with all other Notes) are secured by the Collateral. *See* Mtn. ¶ 23; Hr'g Tr. 22:8-10. Nevertheless, they contend that because, at the time they filed the Involuntary Petition, they executed waivers foregoing their rights to benefit from the Collateral up to the aggregate amount of $15,777 with respect to their holdings of A-2 Notes, they now hold a deficiency claim in that amount and thereby satisfy the eligibility requirement of section 303(b)(1) that they hold an

9

unsecured claim. *See* Mtn. ¶¶ 19-21. Immediately before filing the Involuntary Petition, each Petitioning Creditor executed a (nearly identical) Partial Waiver of Petitioning Creditor (each, a "Partial Waiver") that set forth (a) the outstanding amount of A-1 Notes and A-2 Notes held by each Petitioning Creditor, (b) the Petitioning Creditor's belief that the assets securing the Notes are insufficient to satisfy such Petitioning Creditor's claims under the Notes and that the Petitioning Creditor is therefore undersecured, and (c) "to the extent that there is any question that the Petitioning Creditor is not a qualified creditor pursuant to Bankruptcy Code section 303(b) with respect to the secured or unsecured status of its claims, the Petitioning Creditor hereby waives its right to benefit from the security interests in any assets of the Debtor solely on account of its ownership interests in the Class A-2 Notes up to, but not to exceed, the amount of $5,259.00." PC SOF ¶ 9, Exh. F ¶¶ 2-4.

The Petitioning Creditors cite a number of cases to support their argument that, as a general matter, secured creditors may waive a portion of their security interest in order to qualify as unsecured creditors, eligible to file an involuntary petition. However, none of the cases cited by the Petitioning Creditors support their argument that where, as here, a lien is held in trust by a third party for the collective benefit of multiple parties, a secured creditor may waive its security interest and, by operation of such waiver, be deemed to hold an unsecured claim that it otherwise would not hold; *i.e.* a deficiency claim.

The first case the Petitioning Creditors rely on pre-dates the Bankruptcy Code. *See In re Automatic Typewriter & Service Co.*, 271 F. 1 (2d Cir. 1921). The issue before the Court in that case was whether an involuntary petition commenced under the Bankruptcy Act must be dismissed because, prior to filing the involuntary petition, the sole petitioning creditor obtained a warrant of attachment against the alleged debtor and procured a levy upon its property. *See id.* at

10

2-3. Thus, the Court was called upon to determine whether a petitioning creditor that had "received and has not surrendered a preferential payment because of its levying the attachment . . . therefore is disqualified and estopped from maintaining this petition." *Id.* at 2. The *Automatic Typewriter* case is distinguishable and ultimately not relevant to the issue framed by the Petitioning Creditors' Motion. *Automatic Typewriter* concerned a creditor that specifically had moved to vacate its warrant of attachment against the alleged debtor's property prior to filing the involuntary petition. The issue before the court ultimately turned on whether the fact that the warrant of attachment had not yet been vacated by a formal court order (following a decision granting the motion to vacate) by the time the petition was filed rendered the creditor ineligible to commence the involuntary case. *See id.* The Court held that when the order vacating the attachment is entered, "it will be effective as of the date of decision of the court below vacating the same. This was a date before the bankruptcy." *Id.* at 4. Thus, the Court simply held that the fact that the formal order had not yet been entered, when a decision had been issued, should not result in a dismissal of the involuntary petition since the formal order would date back to the date of the earlier decision. In short, the *Automatic Typewriter* court did not address the extent to which secured creditors may waive a security interest expressly for purposes of qualifying under section 303(b) when the lien at issue is held in trust by a third party for the collective benefit of multiple parties.

The Petitioning Creditors also rely on a more recent case that involved an involuntary petition filed by three subcontractors holding mechanics' liens against a debtor that had defaulted under a construction loan. *See In re East-West Assocs.* 106 B.R. 767, 771 (S.D.N.Y. 1989). After the case was commenced, a lender sought relief from the automatic stay and then moved to dismiss the involuntary case on a number of grounds, including that the petitioning creditors, as

11

holders of secured claims, did not meet the eligibility requirement under section 303(b) insofar as they did not hold an unsecured claim against the debtor. *See id.* at 769-770. The bankruptcy court issued an order granting the lender's motion to dismiss the involuntary case unless the petitioning creditors made monthly adequate protection payments to the lender, and the lender appealed. *See id.* On appeal, the court noted that the petitioning creditors had "released $5,000 each of their unsecured[5] claims, thereby retaining the remainder of their mechanics' liens on the property." *Id.* at 771. Without providing any analysis on the issue, the Court ruled that a "secured creditor may waive all or part of its secured claim to become an eligible unsecured petitioning creditor under Section 303." *Id.* While the *East-West Assocs.* case at first glance appears to lend support to the Petitioning Creditors' position here, the case is distinguishable from this case. In *East-West Assocs.*, the parties holding the liens had waived the requisite portion of their mechanics liens, and consequently were left with their original unsecured claims against the debtor. Here, unlike in *East-West Assocs.*, the Petitioning Creditors do not actually hold the lien that they purport to waive. As such, *East-West Assocs.* does not support the Petitioning Creditors' argument that they are entitled to judgment as a matter of law that they hold an unsecured claim.

Finally, the Petitioning Creditors cite *CC Britain Equities, L.L.C. v. Allen-Main Assocs. Ltd. P'ship (In re Allen-Main Assocs. Ltd. P'ship)*, 223 B.R. 59 (B.A.P. 2d Cir. 1998), in which the Court held that nothing in the Code prohibits a fully secured creditor from filing an involuntary petition, if such secured creditor joined other eligible unsecured creditors holding the requisite aggregate amount of claims. *See id.* at 61. The Court also noted that "[u]nder the

---

[5] It is likely that the Court intended to state that the secured creditors waived a portion of their <u>secured</u> claims (as opposed to their "unsecured claims") since the court was addressing the issue of whether the petitioning creditors, who were secured creditors by virtue of their mechanics liens and who otherwise held no unsecured claims, satisfied the requirement under section 303(b) that petitioning creditors hold unsecured claims.

12

appropriate circumstances, it is also possible for a fully secured creditor to waive all or part of its claim to become an eligible unsecured creditor." *Id.* citing 2 COLLIER ON BANKRUPTCY ¶ 303.08 (15th ed. 1982); *In re East-West Assocs.* 106 B.R. at 771. The Court did not, however, address the issue on which the Petitioning Creditors seek partial summary judgment here - - the extent to which a secured party may waive part of a single lien that it does not hold, but that is held by a third party in trust for the collective benefit of multiple parties.

As the Petitioning Creditors acknowledge, none of the cases cited by the Petitioning Creditors support the argument that a secured creditor may waive a security interest held by a third party – in trust for the benefit of multiple parties – in order to create an unsecured claim and thereby become eligible to file an involuntary petition. *See* Hr'g Tr. 26:12-14. Nonetheless, the Petitioning Creditors contend that waiving a right to benefit from a security interest is no different from waiving a lien for purposes of relinquishing a security interest in order to become eligible under section 303(b) of the Bankruptcy Code. On the facts before it in this case, the Court disagrees. The distinction is particularly relevant here, where the contract giving rise to the security interest and claims at issue – the Indenture – contains express restrictions on actions that may be taken with respect to the security interest and the underlying Collateral. *See, e.g.* SOF, Exh. A § 10.9 (setting forth the circumstances under which the Collateral may be released). The Objecting Parties assert that these contractual restrictions were put in place in order to protect the other Noteholders for whose collective benefit the security interest was conveyed. *See* Opp. ¶ 11 ("This bargained-for protection of more junior noteholders is, in part, a trade-off for standing behind more senior noteholders."). In response, the Petitioning Creditors assert that section 303(b) simply was not drafted to deal with secured bond indenture arrangements where a third party, such as an indenture trustee, holds one lien for the collective benefit of a group of

creditors. *See* Hr'g Tr. 23:14-14, 118:18-20. The Court does not agree. Section 303(b)(1) expressly provides that an involuntary case may be commenced by either a holder of a claim "or an indenture trustee respecting such holder." 11 U.S.C. § 303(b)(1).

For these reasons, the Court finds that the Petitioning Creditors have failed to demonstrate that, under the present circumstances and based on the record before the Court, there is no genuine issue of material fact and that they are entitled to a judgment as a matter of law that the execution of the Partial Waivers makes the Petitioning Creditors holders of unsecured claims with respect to the Class A-2 Notes. Because the Court has determined that the Petitioning Creditors are not, at this stage of the case, entitled to a judgment as a matter of law that the Partial Waivers give rise to unsecured claims under the Indenture, the Court need not reach the issue of whether the Petitioning Creditors may assert such unsecured claims against Taberna, or whether such claims are limited to the Collateral.

## C.    The Common Lien Argument

The Petitioning Creditors' alternative argument is that because, under the Indenture, only one lien is granted to the Trustee for the collective benefit of all Noteholders,[6] the Court need only compare the amount owing on all of the Notes to total the value of the Collateral to make a determination that all Noteholders are undersecured.[7] *See* Mtn. ¶¶ 22 - 26. The Objecting Parties do not dispute that, as of the Petition Date, the aggregate outstanding principal balance and unpaid defaulted interest owing on the Notes totaled $530,403,937.10, and the aggregate

---

[6] The lien was also granted for the benefit of certain other parties identified in the Indenture, as set forth in the Granting Clauses, discussed above.

[7] The Petitioning Creditors further argue that "because the Petitioning Creditors own approximately $154 million of the Notes, they are in turn undersecured by $24 million." Mtn. ¶ 26. This argument was rejected by the Court in *Ionosphere*, *see infra*, which held that separate classes of certificate holders do not hold individual claims under an indenture that provides for only one lien simply because such holders are entitled to separate priority or interest payments.

outstanding par amount of the collateral debt securities, which constitute substantially all of the Collateral, totaled $444,435,481.62.  *See* PC SOF ¶¶ 5, 6; *Objecting Parties' Response to the Petitioning Creditors' Statement of Undisputed Facts* (the "OP SOF") ¶¶ 5, 6.  Based on these numbers, it appears that as of the Petition Date, the aggregate amount owing on all of the Notes exceeds the value of the Collateral.  This fact does not, however, answer the dispositive question of whether the Petitioning Creditors hold an unsecured claim.

In support of their argument, the Petitioning Creditors rely on a bankruptcy court decision by then Chief Judge Lifland, who was called upon to construe an indenture in order to determine whether certain creditors were entitled to post-petition interest on their claims against a liquidating debtor.  *See First Fidelity Bank, N.A. v. Midlantic Nat'l Bank (In re Ionosphere Clubs)*, 134 B.R. 528 (Bankr. S.D.N.Y. 1991).  The indenture at issue in *Ionosphere* provided for the issuance of three series of secured certificates (*i.e.* first priority series, second priority series and third priority series) and designated individual trustees for each series of certificates (*i.e.* a first series trustee, a second series trustee and a third series trustee).  *See In re Ionosphere Clubs*, 134 B.R. at 529.  To secure repayment of all three series of the certificates, the debtor granted a single lien on a designated pool of assets to the collateral trustee.  *See id.*  While the debtor's chapter 11 case was pending, the debtor, the series trustees and the collateral trustee entered into an agreement providing for stay relief and the debtor's turnover of all collateral to the collateral trustee.  *See id*. at 530.  After the collateral had been turned over to the collateral trustee, the collateral trustee received conflicting instructions from the series trustees with respect to the distribution of the collateral among the various series of certificate holders.  *See id.*  As a result, the collateral trustee sought a determination from the bankruptcy court, based on an interpretation of the indenture, as to whether the first series certificateholders held an

15

oversecured claim, thereby entitling them to post-petition interest under Code section 506(b). *See id.* at 531-32.

At the outset of his analysis, Judge Lifland noted that the "touchstone" of each decision on allowance of interest in bankruptcy is a balance of equities among various creditors, or as between creditors and the debtor. *See id.* at 531 (citing *Vanston Bondholders Protective Comm. v.* Green, 329 U.S. 156, 165 (1946)). In this regard, Judge Lifland noted that "[i]n order to decide whether a claim exists . . . for post-petition interest, it must be determined whether, under § 506(b), the three series hold three separate secured claims or are co-owners of one secured claim. Put another way, this Court must determine whether the First Series is the sole owner of an oversecured claim of $187,934,000 or is simply a part owner of an undersecured claim of $453,765,000." *Id.* at 531-32. The first series trustee argued that, notwithstanding that there was only one lien, because there were three separate series with individual trustees, priorities and interests rates, each series represents a separate *claim* for purposes of Bankruptcy Code section 506(b) and accordingly, the first series certificate holders were entitled to post-petition interest payments. *See id.* The Court determined that the indenture provided for only one lien to secure the claims of all three series of certificate holders and, as such, there was only one claim:

> The parties have not cited and this Court has not located any cases that hold that the granting of one lien can give rise to more than one secured claim. While § 506(a) bifurcates an undersecured claim into two claims, one secured and one unsecured, there is no indication in the Code that any similar procedure should be followed to allow separate secured claims to separate classes of certificateholders who jointly hold one lien.

*Id.* Thus, the Court ruled that the indenture provided for one secured claim against the debtor, and that the claim, based on a comparison of the value of the collateral to the aggregate principal amount owing on all three series of certificates, was undersecured. *See id.* Consequently, the

16

Court held that first series certificate holders were not entitled to post-petition interest payments from the concededly insufficient pool of collateral securing all three series of certificates. *See id.*

This Court finds Judge Lifland's rationale in *Ionosphere* inapplicable here in that it was based in large part on a balancing of equities between creditors who held competing claims to a single pool of collateral that was insufficient to satisfy the certificateholders' claims. No such balancing of equities is appropriate in the context of determining whether the Petitioning Creditors hold claims that are unsecured for purposes of section 303(b). Rather, the secured status of the Petitioning Creditors' claims for purposes of determining whether they meet the eligibility requirements of section 303(b) of the Bankruptcy Code must be determined based on a review of the Indenture and related evidence, including without limitation, evidence pertaining to the value of the Collateral.

Even if the Court were to apply the analysis employed in *Ionosphere*, it would not necessarily follow that the Petitioning Creditors hold unsecured claims making them eligible to file an involuntary petition. Under *Ionosphere*, for purposes of determining the secured status of the claim holder, if only one lien is granted under an indenture, there can only be one claim for section 506(b) purposes. The fundamental flaw in the Petitioning Creditors' argument on this point is that the Petitioning Creditors have not carried their burden to demonstrate that they are the holders of the single claim flowing from the single lien, held for the benefit of all Noteholders, under the Indenture. For example, the Granting Clauses of the Indenture strongly suggest that the Trustee (and not the Petitioning Creditors) would be the holder of such claim, for the benefit of all Noteholders, including both the Petitioning Creditors and the Junior Noteholders.

Accordingly, the Court finds that in advancing the single lien argument, the Petitioning Creditors have failed to establish that there are no material issues of fact outstanding and that they are entitled to judgment as a matter of law that they hold undersecured claims against Taberna.

## *CONCLUSION*

For the reasons set forth above, viewing the evidence (here, including most specifically the Indenture) in the light most favorable to the Objecting Parties, the Court concludes that on the record before the Court, the Petitioning Creditors have failed to demonstrate that there is no genuine issue as to any material fact and that they are entitled to a determination, as a matter of law, that they hold undersecured claims against Taberna.

**IT IS SO ORDERED.**

Dated: New York, New York
     November 27, 2017                      *s/ Mary Kay Vyskocil*
                                                    Honorable Mary Kay Vyskocil
                                                    United States Bankruptcy Judge