UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| TABERNA PREFERRED FUNDING IV, LTD., | : | |
| | : | Case No. 17-11628 (MKV) |
| | : | |
| Alleged Debtor. | : | |

---------------------------------------------------------------x

| | | |
|---|---|---|
| TABERNA PREFERRED FUNDING IV, LTD., | : | |
| | : | Adv. Proc. No. 17-01087 (MKV) |
| Interpleader Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| OPPORTUNITIES II LTD., HH HOLDCO CO- | : | |
| INVESTMENT FUND, L.P., REAL ESTATE | : | |
| OPPS LTD., KL FUND II, HILDENE | : | |
| OPPORTUNITIES MASTER FUND II, LTD., | : | |
| WATERFALL ASSET MANAGEMENT LLC, | : | |
| INVESTORS TRUST ASSURANCE SPC, | : | |
| AND CITI GLOBAL MARKETS INC., | : | |
| | : | |
| Interpleader Defendants. | : | |

---------------------------------------------------------------x

**DECISION GRANTING MOTION
FOR JUDGMENT ON PARTIAL FINDINGS AND
<u>DISMISSING THE INVOLUNTARY BANKRUPTCY PETITION</u>**

APPEARANCES:

KLEE, TUCHIN, BOGDANOFF & STERN LLP
*Counsel for the Petitioning Creditors*
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
By: Robert J. Pfister, Esq.
Whitman L. Holt, Esq.

PEPPER HAMILTON LLP
*Counsel for Hildene Opportunities Master Fund II, Ltd.*
620 Eighth Avenue, 37th Floor
New York, New York 10017
By: H. Peter Haveles, Jr., Esq.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Counsel for Hildene Opportunities Master Fund II, Ltd.*
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
By: Eric D. Winston, Esq.

51 Madison Avenue, 22nd Floor
New York, New York 10010
By: Lindsay M. Webber, Esq.

DAVIS POLK
*Counsel for Citigroup Global Markets, Inc.*
450 Lexington Avenue
New York, New York 10017
By: Elliot Moskowitz, Esq.
Brian M. Resnick, Esq.
Justin Sommers, Esq.

MARKO & MAGOLNICK, P.A.
*Counsel for Investors Trust Assurance, SPC*
3001 South West 3rd Avenue
Miami, Florida 33129
By: Joel S. Magolnick, Esq.

KASOWITZ BENSON TORRES LLP
*Counsel for Waterfall Asset Management, LLC*
1633 Broadway
New York, New York 10019
By: Matthew B. Stein, Esq.
Michael A. Hanin, Esq.

MILBANK, TWEED, HADLEY & MCCLOY LLP
*Counsel for TP Management LLC*
28 Liberty Street
New York, New York 10005
By: Gerard Uzzi, Esq.
Daniel M. Perry, Esq.
Alexander B. Lees, Esq.

**MARY KAY VYSKOCIL**
**UNITED STATES BANKRUPTCY JUDGE**

This dispute concerns an involuntary chapter 11 petition filed against Taberna Preferred Funding IV, Ltd., a structured finance entity known as a collateralized debt obligation (commonly referred to as a "CDO"), that issued several series of notes, which descend in priority ("Taberna").  The involuntary petition was filed by three holders of the two most senior classes of notes, Opportunities II Ltd., HH HoldCo Co-Investment Fund, L.P., and Real Estate Opps Ltd. (collectively, the "Petitioning Creditors"), and is opposed by Taberna, its collateral manager, and five holders of the junior classes of notes issued by Taberna.  The movants seek a judgment that three Petitioning Creditors have failed to establish a *prima facie* case that they meet one of the requirements, set forth in section 303(b) of the Bankruptcy Code, to qualify as petitioning creditors eligible to commence this involuntary case, and as such, dismissal of this involuntary petition.

Although the parties opposing the involuntary petition have raised a number of arguments,[1] they now seek judgment that the Petitioning Creditors have not made out a *prima facie* case with regard to only one of the eligibility requirements for filing an involuntary petition, namely, that Petitioning Creditors hold claims against the putative debtor, Taberna.  The parties opposing the involuntary petition argue that the notes are nonrecourse, and accordingly,

---

[1] The Objecting Parties oppose the involuntary petition on a number of other grounds that are not at issue here. Specifically, they contend that an order for relief should not be entered in this case because the Indenture prohibits the Petitioning Creditors from commencing an involuntary bankruptcy case against Taberna and that the Petitioning Creditors are ineligible under section 303(b) of the Bankruptcy Code because they hold oversecured claims.  *See* Noteholders' Prehearing Brief (I) Opposing Granting of the Involuntary Petition and (II) Requesting Dismissal of, or Abstention from this Chapter 11 Case [ECF No. 104].  The Objecting Parties also argue that the case should be dismissed because the Petitioning Creditors filed the involuntary petition in bad faith.  *See id.*  The Petitioning Creditors maintain that nothing in the Indenture or the Notes prohibits holders of A-1 Notes from commencing an involuntary bankruptcy case against Taberna and that the Petitioning Creditors satisfy all of the requirements of section 303 of the Bankruptcy Code, including those not at issue on this motion.  *See* Petitioning Creditors' Opening Brief (I) In Support of an Order for Relief and (II) In Opposition to Dismissal or Abstention [ECF No. 87].

the Petitioning Creditors only hold claims against the collateral securing the notes; *i.e.* they do not hold claims against Taberna.

Whether the Petitioning Creditors hold claims *against Taberna* on account of the notes turns in the first instance on whether the notes are nonrecourse and, if the notes are nonrecourse, on whether sections 1111(b) and 102(2) of the Bankruptcy Code eliminate any distinction between recourse and nonrecourse claims in bankruptcy for purposes of determining the eligibility of a petitioning creditor under section 303(b) such that, notwithstanding the nonrecourse nature of the claims, the Petitioning Creditors hold the requisite claims against Taberna.

This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[2]  For reasons set forth herein, the Court concludes that the Petitioning Creditors do not meet the requirements of section 303(b) of the Bankruptcy Code and are not eligible to commence an involuntary case against Taberna.  Accordingly, judgment should be entered dismissing this case.

In addition, the Court finds that this involuntary case serves no legitimate bankruptcy purpose, Petitioning Creditors would not be prejudiced by dismissal, and it is in the best interest of the creditors and the estate that the case be dismissed.  Accordingly, pursuant to sections 1112

---

[2] The opinion contains both findings of fact ("Findings") and conclusions of law ("Conclusions").  To the extent any findings may be deemed conclusions of law, they shall also be considered Conclusions.  To the extent that any Conclusions may be deemed findings of fact, they shall also be considered Findings. *See, e.g.*, *Bison Capital Corp. v. ATP Oil & Gas Corp.*, No. 10 CIV. 714 SHS, 2011 WL 8473007, at *1 n.1 (S.D.N.Y. Mar. 8, 2011), *aff'd*, 473 F. App'x 40 (2d Cir. 2012) (citing *Miller v. Fenton*, 474 U.S. 104, 113—14 (1985); 9C Wright & Miller, Federal Practice and Procedure § 2579 (3d ed. 2002) (discussing that it is often difficult to categorize a particular matter as a finding of fact or a legal conclusion).

and 105 of the Bankruptcy Code, in the exercise of the Court's discretion, the Court concludes that the case should be dismissed for cause.

**JURISDICTION**

This Court has jurisdiction over this chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M–431), dated January 31, 2012 (Preska, C.J.). The determination of whether an order for relief should be granted in an involuntary case is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(A) and (O). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. All parties to this motion consent to the entry of a final judgment or order with respect to all matters now before the Court. *See* Joint Pretrial Order (the "JPO") § II [ECF No. 132]; *see also* Objecting Parties Proposed Findings of Fact and Conclusions of Law [ECF No. 144-1]; Petitioning Creditors Proposed Findings of Fact and Conclusions of Law [ECF No. 147-1] (stating that the parties have agreed that these proceedings are matters as to which the Court can enter final orders and judgment "including the specific issue presented by the Rule 52(c) Motion . . . .").

**I.**

**A.    Factual Background**

In 2005, Taberna issued eleven classes of notes in the aggregate principal amount of $630,175,000, which descend in priority and have a stated maturity date of May 5, 2036 (collectively, the "Notes"). *See* JPO § III Stipulated Fact ("Stip. Fact") ¶¶ 4-6; JX1[3] at 55-56. The Notes are governed by an indenture dated December 23, 2005 (the "Indenture"). *See* JPO §

---

[3] JX1 refers to Joint Exhibit 1, which is identified in the Joint Pretrial Order as the Indenture (defined below) and hereinafter will be referred to as the Indenture. Other Joint Exhibits will be referred to throughout as "JX" followed by the exhibit number.

III Stip. Fact ¶ 3; Indenture § 14.9.  The funds generated by the issuance of the Notes were used
to purchase various types of securities that were intended to generate proceeds sufficient to repay
the Notes and serve as collateral securing the Notes (collectively, the "Collateral").  *See*
Petitioning Creditors' Statement About the Involuntary Chapter 11 Petition Regarding Taberna
Preferred Funding IV, Ltd. (the "PC Stmt.") [ECF No. 2] ¶¶ 1, 2; JPO § III Stip. Fact ¶1.  The
Collateral consists mostly of long-term securities issued by real estate investment trusts
("REITS") and other real estate entities, *see* PC Stmt. ¶ 10; JPO § III Stip. Fact ¶ 7, and is held in
trust for the benefit and security of, *inter alia*, holders of Notes (collectively, the "Noteholders").
*See* INDENTURE, Granting Clauses.  The Indenture defines "Secured Parties" to include,
among others, the Noteholders.  *See* INDENTURE at 1, 44.

At all times, Taberna has paid Class A Noteholders pursuant to the terms of the
Indenture. *See* JPO § III Stip. Fact ¶¶ 12, 22.  In August 2009, an event of default occurred under
the Indenture due to Taberna's payment default on Class B Notes, notes junior to those now held
by the Petitioning Creditors.   *See* JPO § III Stip. Fact ¶ 17.  The Notes were accelerated the
following month.  *See* JPO § III Stip. Fact ¶ 18.  Over six years later, on March 22, 2016, the
Petitioning Creditors purchased a total of $135,525,044.37 of the most senior class of Notes (the
"A-1 Notes") and a total of $16.9 million of the second most senior class of notes (the "A-2
Notes").  *See* JPO § III Stip. Fact ¶¶ 29, 30.  By virtue of these purchases, at the time of filing,
the Petitioning Creditors held 100% of the A-1 Notes and approximately 34% of the A-2 Notes.
*See* PC Stmt. ¶ 4.

As the Indenture does not permit the Petitioning Creditors unilaterally to liquidate the
Collateral without the consent of other parties, prior to filing the involuntary petition, the
Petitioning Creditors took a number of steps in a failed effort to liquidate the Collateral.  *See* PC

Stmt. ¶ 6; JPO § III Stip. Fact ¶¶ 35-40.  Petitioning Creditors' principal, Vikaran Ghei,

demonstrated at trial that he has experience and expertise in working with complex financial

instruments, and has a sophisticated understanding of the workings of the Bankruptcy Code.  *See*

11/28/17 Tr. 47:24—50:24, Adv. Pro. No. 17-01087 ECF No. 15 ("11/28/17 Tr."); *see also*

11/29/17 Tr. 177:1—17, Adv. Pro. No. 17-01087 ECF No. 16 ("11/29/17 Tr.").  After hiring

counsel that was specifically experienced bankruptcy counsel, *see* 11/30/17 Tr. 108:2—110:24,

Adv. Pro. No. 17-01087 ECF No. 17 ("11/30/17 Tr."); *see also* JPO § III Stip. Fact ¶ 1, among

the steps the Petitioning Creditors took to break open the CDO, in November 2016, Mr. Ghei, on

behalf of Petitioning Creditors, reached out to the indenture trustee and "requested that the

indenture trustee solicit consents to allow the underlying collateral to be liquidated."  PC Stmt. ¶

6; *see also* JPO § III Stip. Fact ¶ 35; Email from Thomas Ji to Vik Ghei, [JX 66].  Mr. Ghei did

not offer any consideration in exchange for the requested consents, and the Petitioning Creditors

ultimately failed to receive sufficient consent to sell the Collateral.  *See* Consent Solicitation [JX

66]; *See* email from Brandon Meyer To Vik Ghei [JX 67]; JPO § III Stip. Fact ¶ 35.  In March

2017, Mr. Ghei, on behalf of Petitioning Creditors, and with the advice and assistance of their

current bankruptcy counsel, launched a tender offer to purchase Notes from each class in

amounts sufficient to allow them to direct the Trustee to auction the Collateral. 11/28/17 Tr.

183:17—184:1, Adv. Pro. No. 17-01087 ECF No. 15; email from Vik Ghei to Brandon Meyer,

[JX 69]; *See* JPO § III Stip. Fact ¶ 36; PC Stmt. ¶ 6.  When that also failed to draw consent, the

Petitioning Creditors subsequently amended their offer, 11/30/17 Tr. 210:22—211:18, Adv. Pro.

No. 17-01087 ECF No. 17; JPO § III Stip. Fact ¶¶ 38-39, but ultimately did not purchase any

Notes pursuant to the original or amended offer.  11/29/17 Tr. 44:9—16, Adv. Pro. No. 17-01087

ECF No. 16; *See* JPO § III Stip. Fact ¶ 40.

The Petitioning Creditors thereafter immediately purchased the remaining A-1 Notes that they did not already own, 11/29/17 Tr. 46:8—10, Adv. Pro. No. 17-01087 ECF No. 16; *see* JPO § III Stip. Fact ¶ 41, and two months later filed the involuntary petition. *See* Involuntary Petition [ECF No. 1]. Petitioning Creditors simultaneously filed a document described as a 'partial waiver' and incorporated the waiver into the involuntary petition. Involuntary Petition [ECF No. 1], Exh. 3; *see also* JPO § III Stip. Fact ¶ 57. Through this document, each of the three Petitioning Creditors waived its right to benefit from security interests in any asset of the alleged debtor solely on account of its ownership interest in the Class A-2 Notes up to, but not to exceed, the amount of $5,259.00. JPO § III Stip. Fact ¶ 57; *see also* Involuntary Petition [ECF No. 1], Exh. 3.

At the time the involuntary petition was filed, the Petitioning Creditors had prepared a draft chapter 11 plan and stated that they were "ready to file their plan and accompanying documents, and then they will promptly pursue confirmation of that plan." PC Stmt. ¶ 8. The plan drafted by the Petitioning Creditors permits an auction of the Collateral at the option of a majority of the holders of the A-2 Notes. *See* Notice of Filing of Certain Unredacted Exhibits to Affidavit of H. Peter Haveles, Jr. Pursuant to Order Amending Prior Order Granting Ex Parte Motion to File Documents Under Seal [ECF No. 82], Exh. D. While Petitioning Creditors do not control a majority of the A-2 Notes with their 34 percent stake, a company named Anchorage owns 50 percent of the A-2 Notes. 11/28/17 Tr. Adv. Pro. No. 17-01087 183:19—22, ECF No. 15. Prior to commencing this case, Petitioning Creditors coordinated with Anchorage, an investor that had previously put another CDO into bankruptcy involuntarily, to effectuate the Chapter 11 proposed plan, which Anchorage agreed to support so long as Anchorage was not "on the front lines". 11/29/17 Tr. 31:20— 35:1, Adv. Pro. No. 17-01087 ECF No. 16; *see also* JX

102 (Mr. Ghei's notes from his phone call with Anchorage discussing how to accomplish an accelerated liquidation of Taberna prior to the involuntary petition). The day after filing the Involuntary Petition, Petitioning Creditors moved to terminate the alleged debtor's exclusivity period in which to file a chapter 11 plan to enable Petitioning Creditors to pursue their proposed plan. *See* Notice of Motion to Terminate the Debtor's Plan Exclusivity Periods [ECF No. 8].

**B.     Procedural History**

Soon after filing the involuntary petition, the parties entered a stipulation, which the Court so ordered, establishing a schedule for expedited discovery including expert discovery and the briefing of any threshold legal issues. So Ordered Stipulation [ECF No. 45]. At the close of discovery, the Petitioning Creditors moved for partial summary judgment, seeking a ruling that, having filed waivers of the lien on the collateral, *see* JPO § III Stip. Fact ¶ 57, they now held *unsecured* claims against Taberna, thereby satisfying one of the eligibility requirements in dispute under section 303(b) of the Bankruptcy Code (*i.e.* a different requirement than the one at issue on this motion). *See* Petitioning Creditors' Motion for Partial Summary Judgment [ECF No. 51].[4] TP Management LLP, as collateral manager (the "Collateral Manager"), and several holders of Notes junior to the A-1 and A-2 Notes (collectively, the "Junior Noteholders"[5] and together with the Collateral Manager, the "Objecting Parties") opposed the summary judgment motion, arguing that summary judgment should be denied because the Petitioning Creditors' Note claims are both oversecured and non-recourse. *See* Opposition to Petitioning Creditors'

---

[4] Pursuant to the So Ordered Stipulation among the Parties [ECF No. 45] the Summary Judgment Motion was filed in the main bankruptcy case, Case No. 17-11628-MKV, and the Adversary Proceeding commenced by the putative debtor, Adv. Pro. No. 17-1087-MKV (seeking dismissal of this case or abstention) has been held in abeyance.

[5] The Junior Noteholders include Hildene Opportunities Master Fund II, Ltd. ("Hildene"), Waterfall Asset Management LLC ("Waterfall"), Investors Trust Assurance SPC ("ITA"), EJF Capital LLC ("EJF") and Citigroup Global Markets Inc. ("Citibank"). Collectively, they hold over $85 million in principal amount of Notes.

Motion for Partial Summary Judgment [ECF No. 65].  By decision dated November 27, 2017, the Court denied the Petitioning Creditors' summary judgment motion on the issue of whether they hold unsecured claims against Taberna on the grounds that they had failed to establish that there were no material issues of fact and that they were entitled to judgment as a matter of law. *See* Decision Denying Motion for Partial Summary Judgment [ECF No. 133] (the "Summary Judgment Decision").

Thereafter, a bench trial commenced on the disputed issue of the eligibility of Petitioning Creditors to maintain this case.  After five days of trial, at which Vikaran Ghei (one of two Principals of the Petitioning Creditors) and two experts (who testified with respect to valuation issues not relevant on this motion) testified, excerpts of depositions were offered, and over 140 exhibits were received into evidence.  At the close of the Petitioning Creditors' case in chief, the Objecting Parties moved pursuant to Rule 52(c) of the Federal Rules of Civil Procedure for a judgment on partial findings (the "Motion" or "Mtn.").  *See* The Objecting Parties' Motion Under Rule 52(c) of the Federal Rules of Civil Procedure for Judgment on Partial Findings [ECF No. 144].

In their Motion, the Objecting Parties seek a determination that the Petitioning Creditors' claims with respect to the Notes (the "PC Note Claims") are nonrecourse and, as holders of nonrecourse claims, the Petitioning Creditors are ineligible under section 303(b) of the Bankruptcy Code to file an involuntary petition.  Taberna supports the Motion.  *See* Alleged Debtor's Joinder in The Objecting Parties' Motion Under Rule 52(c) of the Federal Rules of Civil Procedure for Judgment on Partial Findings [ECF No. 145].  The parties submitted findings of fact and conclusions of law and thereafter the Court heard oral argument on the motion.  ECF Nos. 144—152.  The narrow issues before the Court on this Motion are (1) whether the PC Note

Claims are nonrecourse, and (2) whether the Petitioning Creditors nonetheless meet the eligibility criteria of section 303(b) of the Bankruptcy Code requiring that they hold claims against Taberna.

While the Rule 52 motion was pending, the Second Circuit issued a decision in *Wilk Auslander LLP v. Murray (In re Murray)*, affirming that a bankruptcy court has the authority to dismiss *sua sponte* an involuntary chapter 7 bankruptcy case for cause.  900 F.3d 53 (2d Cir. 2018).  In light of *Murray*, the Court issued an order directing the parties to show cause with respect to whether this case should be dismissed for cause pursuant to section 1112(b) of the Bankruptcy Code.  [ECF No. 153].  The parties submitted briefing on the issue [ECF Nos. 154—159], and on October 18, 2018, the Court heard oral argument on the section 1112 issue.

## II.
## LEGAL STANDARDS WITH RESPECT
## TO MOTION FOR JUDGMENT ON PARTIAL FIDINGS

### A.    Rule 52(c) of the Federal Rules of Civil Procedure

Rule 52(c) of the Federal Rules of Civil Procedure, which applies here pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure,[6] provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

---

[6] Although Bankruptcy Rule 7052 provides that Federal Rule 52 applies in adversary proceedings, the parties are in agreement that Federal Rule 52(c) applies here, where Taberna initially raised the issues addressed herein in an adversary proceeding entitled *Taberna Preferred Funding IV, Ltd. v. Opportunities II Ltd, et al.*, Adv. Pro. No. 17-01087 (MKV) (the "Adversary Proceeding") and the parties subsequently agreed that all pleadings shall be filed solely in the main case, not the Adversary Proceeding, pending the outcome of the trial, and that all further proceedings in the Adversary Proceeding would be held in abeyance.  *See* So Ordered Stipulation [ECF No. 45].

Fed. R. Civ. P. 52(c).  Thus, judgment under Federal Rule 52(c) is appropriate where a plaintiff

has failed to make out a *prima facie* case.  *Latin Am. Music Co., Inc. v. Spanish Broad. Sys., Inc.*,

254 F. Supp. 3d 584, 587 (S.D.N.Y. 2017), *aff'd*, 738 F. App'x 722 (2d Cir. 2018) ("A

defendant's Rule 52(c) motion may be granted when 'the plaintiff has failed to make out a prima

facie case or where the plaintiff has made out a prima facie case but the court determines that a

preponderance of the evidence goes against the plaintiff's claim.'"); *see also Pal v. New York

Univ.*, No. 06 CIV. 5892 PAC FM, 2013 WL 4001525, at *1 (S.D.N.Y. Aug. 6, 2013), *aff'd*, 583

F. App'x 7 (2d Cir. 2014).

When considering a motion under Federal Rule 52(c), a court does not consider the

evidence in the light most favorable to the non-moving party or draw any special inferences in

the non-movant's favor.  *See Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 433

(S.D.N.Y. 2004); *Desiderio v. Celebrity Cruise Lines, Inc.*, No. 97 Civ. 5185(AJP), 1999 WL

440775, at *19 (S.D.N.Y. June 28, 1999).  "Instead, the court acts as both judge and jury, and

decides the case based upon where the preponderance lies."  *Empire State Bldg. Co. v. New York

Skyline, Inc. (In re New York Skyline, Inc.)*, Adv. Nos. 09–1107 (SMB), 09–1145(SMB), 2013

WL 655991, at *4 (Bankr. S.D.N.Y.  Feb. 22, 2013) (citing *Desiderio v. Celebrity Cruise Lines,

Inc.*, 1999 WL 440775, at *19).

**B**.    **Bankruptcy Code Section 303(b)**

Section 303 of the Bankruptcy Code governs involuntary bankruptcy cases under

chapters 7 and 11 and stipulates that an involuntary case may be commenced "only against a

person . . . that may be a debtor under the chapter under which such case is commenced." 11

U.S.C. § 303(a).  Section 303 goes on to set forth the minimum number of creditors required to

commence an involuntary case and contains restrictions as to which types of creditors may

commence an involuntary bankruptcy case. Specifically, pursuant to section 303(b)(1), an

involuntary case may be commenced

> by three or more entities, each of which is either a holder of a *claim
> against such person* that is not contingent as to liability or the
> subject of a bona fide dispute as to liability or amount, or an
> indenture trustee representing such a holder, if such noncontingent,
> undisputed claims aggregate at least $15,775 more than the value of
> any lien on property of the debtor securing such claims held by the
> holders of such claims.

11 U.S.C. § 303(b)(1) (emphasis added). Section 303(b) thus requires that an involuntary

petition be brought by at least three qualifying creditors[7] and that each such creditor holds a

claim *against the target of the involuntary petition*. 11 U.S.C. § 303(b)(1).

A petitioning creditor bears the initial burden of establishing a *prima facie* case that it

meets the eligibility requirements set forth in section 303(b) of the Bankruptcy Code. *See, e.g.*,

*In re Persico Contracting and Trucking, Inc.,* No. 10–22736 (RDD), 2010 WL 3766555, at *3

(Bankr. S.D.N.Y. Aug. 10, 2010); *see also Platinum Fin. Servs. Corp. v. Byrd (In re Byrd)*, 357

F.3d 433, 437 (4th Cir. 2004); *In re Gutfran*, 210 B.R. 672, 673 (Bankr. D. Conn. 1997). Once a

*prima facie* case has been established, the burden then shifts to the entity against whom the

involuntary petition has been filed to demonstrate that the eligibility requirements have not been

met. *See In re Persico Contracting and Trucking, Inc.,* 2010 WL 3766555, at *3; *In re Byrd*, 357

F.3d at 439; *In re Gutfran*, 210 B.R. at 673.

The Petitioning Creditors have been fully heard on the section 303 eligibility

requirements. Therefore, if the Court finds that the Petitioning Creditors have not met their

burden of establishing a *prima facie* case that they satisfy the eligibility requirement in section

---

[7] Section 303(b)(2) of the Bankruptcy Code contains a variation on these requirements for circumstances, not present
in this case, where there are fewer than twelve creditors. The number of creditors required under section 303(b) is
not in dispute on this motion.

303(b) of the Bankruptcy Code, the Court may enter judgment against them on this issue and the petition in this involuntary case should be dismissed.

### III.

### FINDINGS OF FACT AND CONCLUSION OF LAW
### WITH RESPECT TO WHETHER PETITIONING
### CREDITORS HOLD A CLAIM AGAINST TABERNA

**A.     The Notes are Nonrecourse**

The Objecting Parties assert that pursuant to the terms of the Indenture, the Notes are nonrecourse and therefore the Petitioning Creditors do not hold claims against Taberna since their claims are limited to the Collateral.  *See* Mtn. ¶¶ 17, 20, 22.  The Petitioning Creditors, on the other hand, assert that the Indenture does not yet, if ever, preclude claims against Taberna or otherwise limit the PC Note Claims to claims against the Collateral.  *See* Petitioning Creditors' Opposition to the Objecting Parties' Motion under Rule 52(c) of the Federal Rules of Civil Procedure for Judgment on Partial Findings (the "Opposition" or "Opp.") [ECF No. 147] ¶¶ 34-51.  Based on its review of the Indenture [JX1], the Court finds that the Notes are nonrecourse.

The term "nonrecourse" describes a type of debt that is "of, relating to, or involving an obligation that can be satisfied only out of the collateral securing the obligation and not out of the debtor's other assets."  Black's Law Dictionary (10th ed. 2014).  A nonrecourse note is "[a] note that may be satisfied upon default only by means of the collateral securing the note, not by the debtor's other assets."  *Id.*  Similarly, a "nonrecourse creditor is a creditor who has agreed to look only to its collateral for satisfaction of its debt and does not have any right to seek payment of any deficiency from a debtor's other assets."  *In re 680 Fifth Ave. Assocs. v. Mut. Benefit Life Ins. Co. (In re 680 Fifth Ave. Assocs.)*, 156 B.R. 726, 732-33 (Bankr. S.D.N.Y. 1993), *aff'd*, 169 B.R. 22 (S.D.N.Y. 1993) *aff'd*, 29 F.3d 95 (2d Cir. 1994); *see also In re Montgomery Ward,*

14

*LLC*, 634 F.3d 732, 740 (3d Cir. 2011) ("A claim secured by a nonrecourse security interest is, by definition, enforceable only against the debtor's property.  A claim secured by a recourse security interest is enforceable against both the collateral and, to the extent the claim exceeds the value of the collateral, against the debtor.").

To determine whether the Notes are nonrecourse, the Court looks to the Indenture [JX1], which is governed by New York state law.  *See* JX 1 INDENTURE § 14.9. The plain meaning of the language controls the construction of contracts governed by New York state law.  *See City of Hartford v. Chase*, 942 F.2d 130, 134–35 (2d Cir. 1991) (quoting *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985)); *V.C. Vitanza Sons v. New York City Hous. Auth.*, 7 A.D.3d 398, 776 N.Y.S.2d 472 (1st Dep't 2004) ("In interpreting a contract, the plain meaning of words and phrases should be determined and the language construed so as to give full meaning and effect to all provisions of the agreement.").  When called upon to construe a contract, a court should ascribe to the contract terms their ordinary meanings unless doing so would lead to an absurd result.  *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006).  A court's role in construing a contract is to "give effect to the intent of the parties as revealed by the language they chose to use."  *Seiden Assocs. Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (citing *Slatt v. Slatt*, 64 N.Y.2d 966, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (N.Y. 1985)).  Moreover, it is presumed that every clause in a contract was intended to have an effect.  *See City of Hartford v. Chase,* 942 F.2d 130, 135 (2d Cir. 1991).  If a contract is unambiguous, its meaning should be determined without reference to extrinsic evidence.  *Goldman v. Comm'r of Internal Revenue*, 39 F.3d 402, 406 (2d Cir. 1994) (citing *Goodheart Clothing Co. v. Laura Goodman Enters.*, 962 F.2d 268, 272 (2d Cir. 1992)).  Whether the language in a contract is ambiguous is a question of law, *see Seiden Assocs.*, 959 F.2d at 429, determined by reference to

15

the contract alone. *See Goodheart*, 962 F.2d at 272.

    The Court finds that the relevant provisions of the Indenture are unambiguous. Section

2.6(h) of the Indenture, [JX 1], provides as follows:[8]

> The obligations of the Co-Issuers under the Notes and this Indenture are non-recourse obligations of the Co-Issuers payable solely from the Collateral and in accordance with the Priority of Payments, and following realization of the Collateral and its reduction to zero any claims of the Noteholders shall be extinguished and shall not thereafter revive.
>
> No recourse shall be had against any Officer, Preferred Shareholder, director, manager, employee, security holder or incorporator of the Issuer, the Co-Issuer, the Collateral Manager, the Trustee, any Rating Agency, the Placement Agent or their respective successors or assigns for the payment of any amounts payable under the Notes or this Indenture.
>
> It is understood that the foregoing provisions of this Section 2.6(i) [sic] shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement that is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished.
>
> It is further understood that the foregoing provisions of this Section 2.6(i) [sic] shall not limit the right of any Person to name either Co-Issuers as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

JX 1, INDENTURE, § 2.6(h). Non-recourse provisions are enforceable under New York state

law. *See, e.g.*, *Bronxville Knolls, Inc. v. Webster Town Ctr. P'ship*, 221 A.D.2d 248, 634

N.Y.S.2d 62 (2d Dep't 1995) (holding that "non-recourse clause of integrated mortgage and

---

[8] The Court has added spaces in between sentences for ease of reference.

mortgage note precluded the underlying action by the plaintiffs for a personal judgment as against the defendants" because "the only recourse in connection with the underlying loan was the mortgaged property").

Applying the plain meaning of the language in section 2.6(h) and other provisions of the Indenture, the Court concludes that the Indenture explicitly provides that the Notes are nonrecourse and that Taberna shall have no personal liability with respect to the Notes.  The first line of section 2.6(h) is unambiguous in stating that the Notes are nonrecourse: "[t]he obligations of the Co-Issuers under the Notes and this Indenture are non-recourse obligations of the Co-Issuers payable solely from the Collateral . . . ."  JX 1, INDENTURE § 2.6(h).  The Co-Issuers include Taberna, as Issuer, and Taberna Preferred Funding IV, Inc., as Co-Issuer.  *See* JX 1, INDENTURE, p. 1.  The remainder of the first line of section 2.6(h) provides that once the Collateral (here, various types of long-term securities) has been fully liquidated, the Noteholders' claims shall be extinguished.  JX 1, INDENTURE § 2.6(h).  This is consistent with the nature of nonrecourse debt; as once the Collateral has been exhausted, the Noteholders cannot look to Taberna to recover any deficiency because payment on the Notes will be "solely from the Collateral" and not from Taberna.  Similarly, the fourth line of section 2.6(h) provides that although Noteholders may name Taberna as a defendant in an action when exercising other remedies under the Indenture, they are prohibited from either seeking a deficiency judgment or any personal liability against Taberna.  JX 1, INDENTURE § 2.6(h).

The Petitioning Creditors argue, that the third line of section 2.6(h) limits the first line of section 2.6(h) (each quoted above) by providing that the Notes do not become nonrecourse *until* the Collateral has been realized.  *See* Opp. ¶ 42.  Thus, according to the Petitioning Creditors, the Noteholders' claims are not presently limited to the Collateral because the Collateral has not

17

been fully liquidated, and only when the Collateral eventually is fully liquidated, will the Noteholders' claims then be limited to the Collateral.  In other words:  The Noteholders' claims will not be limited to the Collateral until after the Collateral has been liquidated.

The Court disagrees with this construction of the third line of section 2.6(h), which is not supported by the plain meaning of the provision, any other provision of the Indenture, or common sense.  This proposed construction is belied by the first line of section 2.6(h), which contains an unqualified statement that the Notes *are* (as opposed to "will be, once the Collateral is liquidated") nonrecourse, as well as the fourth line of section 2.6(h), which prohibits Noteholders, with no temporal limitation, from seeking to hold Taberna personally liable on account of the Notes.  The fourth line of section 2.6(h) does not qualify its prohibition on actions seeking a deficiency judgment against Taberna until after the Collateral has been liquidated.  Moreover, the third line of section 2.6(h) is unambiguous.  It does not provide that the Notes only become nonrecourse upon the occurrence of a subsequent event; *i.e.* the liquidation of the Collateral.  Instead, it simply explains that, notwithstanding the first and second lines of section 2.6(h), section 2.6(h) shall not be construed as either preventing recourse to the Collateral or affecting a "waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by [the] Indenture until such Collateral has been realized."  This is consistent with the first line of section 2.6(h), which provides that "following realization of the Collateral and its reduction to zero" the Noteholders' claims shall be extinguished.  In this context, the claims are to be extinguished precisely because they are limited to the Collateral.

The Petitioning Creditors also point to several other provisions of the Indenture that contain generalized references to Taberna's payment obligations with respect to the Notes.  *See*

18

Opp. ¶ 36 (referencing sections 2.4(a),[9] 5.3(c),[10] 7.1[11] and 14.12[12]).   While these sections

reference a payment obligation of Taberna under the Indenture, they by no means give rise to

any obligation to repay the Notes from any of its assets other than the Collateral.   Nor do they

provide that Taberna shall bear any personal liability on account of the Notes.   Moreover, these

provisions neither conflict with, nor give rise to any ambiguity concerning, the plain language of

section 2.6(h).

**B.     The Bankruptcy Code Does Not Eliminate the Distinction Between
        Recourse and Non-Recourse Debt for the Purposes of Considering
        Eligibility to Commence an Involuntary Chapter 11 Case.**

The Petitioning Creditors contend that even if the Notes are nonrecourse, the Petitioning

Creditors nevertheless hold claims *against Taberna* because section 102(2) and, in cases

commenced under chapter 11 of the Bankruptcy Code, section 1111(b)(1), eliminates any

distinction between recourse and nonrecourse debt *against Taberna* for the purposes of

determining their eligibility under section 303(b).   *See* Opp. ¶¶ 2, 12-32.   The Court concludes

---

[9] Section 2.4(a) provides as follows:  "All Notes and Combination Notes issued and authenticated upon any registration of transfer or exchange of Notes and Combination Notes shall be the valid obligations of [Taberna] . . . evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes and Combination Notes surrendered upon such registration of transfer or exchange."  JX1, INDENTURE § 2.4(a).

[10] Section 5.3(c) provides as follows:  "The Co-Issuers covenant . . . that if a Default shall occur in respect of the payment of any principal of or interest on . . . any Class A Note or Class B Note . . . Class C Note, Class D Note or Class E Note . . . the Co-Issuers . . . will upon demand of the Trustee or any affected Noteholder, pay to the Trustee, for the benefit of the Holder of such Note, the whole amount, if any, then due and payable on such Note for principal and interest . . . and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest at the applicable Note Interest Rate and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and such Noteholder and their respective agents and counsel."  JX1, INDENTURE § 5.3(c).  The Petitioning Creditors also cite section 5.3(a) of the Indenture, which authorizes the Trustee to file and prove a claim with respect to the notes in any bankruptcy case concerning Taberna.  *See* Opp., ¶ 44.

[11] Section 7.1 provides as follows:  "The Co-Issuers will duly and punctually pay all principal, interest . . . and other amounts owing hereunder or under any other agreement or instrument to which the Issuer or the Co-Issuer is a party in accordance with the terms of the Notes, this Indenture and such other agreements or instruments."  JX1, INDENTURE § 7.1.

[12] Section 14.12 provides that "payment obligations of [Taberna] under this Indenture and the Notes shall not be discharged by any amount in another currency."  JX1, INDENTURE § 14.12.

that the Bankruptcy Code does differentiate between recourse and nonrecourse Notes and that the Notes should not be characterized as recourse for the purposes of determining eligibility to commence an involuntary Bankruptcy Case.

1.      Bankruptcy Code Section 1111(b)

The Petitioning Creditors argue that section 1111(b) of the Bankruptcy Code "eliminates any distinction in chapter 11 between recourse and nonrecourse debt," and therefore, when determining whether a petitioning creditor holds a claim against the entity that is the subject of an involuntary petition as required under section 303(b), nonrecourse creditors must be treated as holding recourse claims.  Opp. ¶¶ 2, 12.  The Objecting Parties, on the other hand, contend that section 1111(b) takes effect only after a bankruptcy case has been commenced and an estate comes into existence, and that it does not operate to render a party eligible to file an involuntary petition based on subsequent events that may or may not occur, particularly when that party otherwise would not meet the requirements of section 303(b).  *See* The Obj. Parties' Reply Mem. of Law in Supp. of Their Mot. Under Rule 52(c) of the Fed. Rules of Civil Proc. for J. on Partial Findings (the "Reply Brf.") ¶¶ 5, 6 [ECF No. 15].  TP Management joins the Objecting Parties' position that section 1111(b) is not applicable here, however for different reasons.  TP Management argues that section 1111(b) is inapplicable because the "Noteholders here have contractually forfeited any right to assert a deficiency claim under section 1111(b) or otherwise since they agreed in the Indenture that 'no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against' the Issuer."  TP Management LLC's Answer to the Involuntary Chapter 11 Petition [ECF No. 20 ¶43].

The Court turns to the plain language of both statutes to resolve this issue.  If a statute's language is plain, the court's only function is to enforce the statute according to its terms.  *See*

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  By its terms, Section 1111(b)

governs how undersecured nonrecourse claims are to be treated under a debtor's chapter 11 plan

"for allowance and distribution purposes," and provides as follows:

> (1)(A) A claim secured by a lien on property of the estate *shall be allowed or disallowed* under section 502 of [the Bankruptcy Code] the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless
>
>> (i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or
>>
>> (ii) such holder does not have such recourse and such property is sold under section 363 of [the Bankruptcy Code] or is to be sold under the plan.
>
> (B) A class of claims may not elect application of paragraph (2) of this subsection if –
>
>> (i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or
>>
>> (ii) The holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of [the Bankruptcy Code] or is to be sold under the plan.
>
> (2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

11 U.S.C. § 1111(b) (emphasis added).

The language of section 1111(b) is clear and unambiguous, and provides that an

undersecured, nonrecourse creditor in a chapter 11 case may, *for allowance and distribution*

*purposes*, have its claim split into an allowed *secured* claim equal to the value of the collateral

and an allowed *unsecured* claim for the deficiency (notwithstanding that the claim is

nonrecourse), *unless* either (a) the class of which the creditor's claim is a part elects to have the

claim treated as a fully secured claim or (b) the creditor holds a nonrecourse claim and the collateral is sold under section 363 of the Bankruptcy Code or pursuant to a chapter 11 plan.

As an initial matter, the plain language of section 1111(b) makes clear that "the recourse transformation is for distribution purposes only. The Code provision does not change the nature or terms of a creditor's security interest." *In re Montgomery Ward, LLC*, 634 F.3d at 740 (citing *In re DRW Prop. Co.*, 57 B.R. 987, 992 (Bankr. N.D. Tex. 1986)); *see id.* ("The transformation of non-recourse claims into recourse claims is for distribution purposes only in a Chapter 11 reorganization case where the debtor has been given the power to retain encumbered property (over the objection of the secured creditor) for use in its plan of reorganization."); *Travelers Ins. Co. v. 633 Third Assocs.*, No. 91 CIV. 5735 (CSH), 1991 WL 236842, at *2 (S.D.N.Y. Oct. 31, 1991) (citing *In re DRW Prop. Co.*, 57 B.R. at 992); 11 U.S.C. §1111(b) ("A claim secured by a lien on property of the estate *shall be allowed or disallowed* under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse . . . .")(emphasis added); *see also* 7 Collier on Bankruptcy ¶ 1111.03[1](c) (16th ed. 2018) ("Thus, although the claim becomes recourse against the debtor for purposes of distribution, it remains a nonrecourse claim for all other purposes.").

Section 1111(b) does not, as the Petitioning Creditors argue, unequivocally treat all nonrecourse claims as recourse under all circumstances, or, for our purposes, at commencement of every chapter 11 case. Instead, *for allowance purposes*, it permits an undersecured nonrecourse claim to be allowed as recourse claim *only if* certain requirements are met: *i.e.* if the claim is not treated as fully secured under section 1111(b)(1)(A)(i) *and* the collateral securing the claim is not sold pursuant to either section 363 or pursuant to a plan. The second condition is

22

based on the rationale that if the "collateral is to be sold, the undersecured creditor does not get recourse because the nonrecourse lender may, under 11 U.S.C. § 363(k), bid in the undersecured portion of its claim when the collateral is sold." *In re 680 Fifth Ave. Assocs. v. Mut. Benefit Life Ins. Co. (In re 680 Fifth Ave. Assocs.)*, 156 B.R. 726, 733 (Bankr. S.D.N.Y. 1993), *aff'd*, 169 B.R. 22 (S.D.N.Y. 1993) *aff'd*, 29 F.3d 95 (2d Cir. 1994). Thus, if an order for relief were to be granted with respect to the involuntary petition, and if the Collateral were subsequently sold either pursuant to section 363 or as part of a chapter 11 plan, the Petitioning Creditors' nonrecourse claims would not be entitled to recourse treatment under section 1111(b). *Id.* ("[I]f the plan of reorganization provides that collateral is to be sold, the undersecured creditor does not get recourse because the lender may . . . bid in the undersecured portion of its claim when the collateral is sold."); 124 Cong. Rec. 32, 406 -07 (1978) (explaining that section 1111(b) does not afford recourse status to nonrecourse creditors "if the property securing the loan is sold under section 363 or is to be sold under the plan"). Because it is not clear at this stage of the proceedings whether the claims will ultimately qualify for recourse treatment under section 1111(b), there is no reason for the Court to conclude at this time that the Petitioning Creditors' nonrecourse claims are presently entitled to allowance as recourse claims under section 1111(b).[13] In any event, allowance of Petitioning Creditors' claim is not the issue now before the Court.

Moreover, even if the Court were to conclude that the language of section 1111(b) is ambiguous and fails in itself to resolve the conflicting interpretations offered by the parties, a review of the purpose underlying section 1111(b) supports the Court's conclusion. *See*

---

[13]The construction of section 1111(b) urged by the Petitioning Creditors also has the potential to lead to an inequitable scenario given the Petitioning Creditors' ultimate desire to liquidate the Collateral, such that section 1111(b) would operate to treat their nonrecourse claims as recourse claims for purposes of their eligibility under section 303(b), but not affect the nonrecourse nature of their claims for allowance and distribution purposes.

*Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 6 (2d Cir. 2017) ("If resorting to the plain text alone fails to resolve the question," courts may test competing interpretations against both the text of the statute and the legislative purpose and history).

Section 1111(b) was designed to protect the rights of nonrecourse lienholders in chapter 11 reorganizations "where the debtor elects to retain the collateral property." *680 Fifth Ave. Assocs. v. Mutual Benefit Life Ins. (In re 680 Fifth Ave. Assocs.)*, 29 F.3d 95, 97 (2d Cir. 1994). Congress enacted section 1111(b) in response to one case, *In re Pine Gate Associates, Ltd.*, 2 Bankr.Ct. Dec. 1478 (Bankr. N.D. Ga. 1976), which was brought under Chapter XII of the former Bankruptcy Act of 1898, which allowed a debtor to utilize its "cramdown" powers to retain collateral (in the form of real property) that was subject to a nonrecourse lien. *See In re 680 Fifth Ave. Assocs.*, 156 B.R. at 730-31; *In re B.R. Brookfield Commons No. 1 LLC*, 735 F.3d 596, 599 (7th Cir. 2013) (citing *Great Nat'l Life Ins. Co. v. Pine Gate Assocs.*, 2 Bankr. Ct. Dec. 1478 (Bankr. N.D. Ga. 1976)). The *Pine Gate Associates* case concerned a debtor that was able to retain its collateral by ascribing a low value to it through a judicial valuation, as opposed to an auction. *See In re B.R. Brookfield Commons No. 1 LLC*, 735 F.3d at 599-600 (citing *In re Atlanta West VI*, 91 B.R. 620, 623 (Bankr. N.D. Ga. 1988)). In *Pine Gate*, a depressed real estate market enabled the debtor to undervalue the collateral ( relative to the outstanding debt secured by the collateral), and "cash out" its secured lender by paying only the valuation amount to the nonrecourse undersecured lender. *In re B.R. Brookfield Commons No. 1 LLC*, 735 F.3d at 599-600. The debtor in *Pine Gate* was able to retain the collateral in large part because "the absence of a public sale prevented the mortgagee from bidding in its liens, and the nonrecourse nature of the loan barred the lender from asserting an unsecured deficiency claim." *In re 680 Fifth Ave. Assocs.*, 156 B.R. at 730. To avoid this type of result, "Congress enacted § 1111(b) to give

24

undersecured creditors 'a voice in the Chapter 11 process to the extent that the undersecured

creditor may dominate the vote within the unsecured class . . . ,'" *Id.* at 731, and because a

judicial valuation of collateral (as opposed to a public sale or foreclosure) "was not part of a

nonrecourse creditor's bargain." *B.R. Brookfield Commons*, 735 F.3d at 600.

Thus, section 1111(b) gives the nonrecourse lender a voice by enabling it to vote using its

unsecured deficiency claim in connection with the debtor's chapter 11 plan. "Absent the

unsecured deficiency claim, the undersecured nonrecourse creditor would not be able to vote so

long as it received the collateral's appraised value." *In re Montgomery Ward, LLC*, 634 F.3d

732, 740 (citing 11 U.S.C. §§ 1124(1), 1126(f)). The purpose and legislative history of section

1111(b) make clear that this section of the Bankruptcy Code was enacted to protect undersecured

lenders in cases where debtors seek to retain the collateral, through a judicial valuation of the

collateral, in the context of a cramdown. Section 1111(b) was not enacted to give nonrecourse

lenders (*i.e.* secured lenders up to the value of their collateral who hold no unsecured claims

against their borrower) a right to commence an involuntary bankruptcy case against their

borrower.

Notwithstanding that the apparent goal of Petitioning Creditors is to liquidate Taberna,[14]

*see* JPO § III Stip. Fact ¶¶29-39, curiously, Petitioning Creditors elected to file this involuntary

case under Chapter 11 and not under Chapter 7.[15]

---

[14] One day after filing the involuntary petition, the Petitioning Creditors moved to terminate the exclusivity period under the code for a debtor to file a chapter 11 plan, in order to move forward with their own proposed plan immediately. [ECF No. 8]. Petitioning Creditors' Proposed Chapter 11 Plan is a liquidating plan, which contemplates accelerated payment on the notes. *See* Notice of Filing of Certain Unredacted Exhibits to Affidavit of H. Peter Haveles, Jr. Pursuant to Order Amending Prior Order Granting Ex Parte Motion to File Documents Under Seal [ECF No. 82], Exh. D.

[15] Objecting Creditors argue that this, along with other facts, call into question Petitioning Creditor's good faith, and that Section 1112(b)provides an independent ground for dismissal for cause by reason of a bad faith filing. *See* Noteholders' Brief (I) Opposing Granting of the Involuntary Petition and (II) Requesting Dismissal of, or Abstention from, This Case [ECF No. 101] ¶ D. Objecting Creditors have not moved for judgment on grounds of a

It is pivotal to recognize that creditors' ability to bring a debtor into bankruptcy can be abused. "In part because of the unusual nature of involuntary petitions, Congress provided bankruptcy courts with a variety of tools with which to police their use." *Wilk Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53 (2d Cir. 2018). By enacting section 303 Congress entrusted bankruptcy courts with the tools necessary to protect debtors from abusive involuntary petition practice. Fundamentally, Section 303(b) is a "gating" provision, intended to place limitations on the commencement of involuntary cases. The Court rejects Petitioning Creditors' bootstrapping attempt to invoke section 1111—a provision dealing with the allowance of claims in a Chapter 11 case—to support an argument regarding their eligibility to *commence* an involuntary Chapter 11. By its terms section 1111 applies only once a Chapter 11 case exists; it cannot be used to validate an otherwise ineligible Chapter 11 involuntary petition.

In short, Petitioning Creditors' attempt to invoke section 1111 as authority to support their eligibility under section 303 must be rejected. The Court concludes that section 1111(b) is not applicable for the purposes of determining a party's eligibility to initiate an involuntary bankruptcy under section 303. Questions of whether a claim should be allowed and regarding its secured status are properly entertained *not* in connection with the validity of the involuntary bankruptcy petition, but only later, at trial or a hearing on the allowance of the claim itself *after* the involuntary bankruptcy case is underway. Here, the Court has not entered an order for relief, and therefore there is no Chapter 11 case such that section 1111(b) can be triggered. *See In re Allen-Main Assocs. Ltd. P'ship*, 223 B.R. 59, 63 (B.A.P. 2d Cir. 1998) ("Section 1111(b) applies only to proceedings under Chapter 11 of the Bankruptcy Code."); *see also Travelers Ins. Co. v.*

---

bad faith filing, and accordingly, the Court does not address the issue of Petitioning Creditors' good faith, or lack therefore, at this time. As noted below in Section IV, however, this fact when viewed in the totality of all of the circumstances, contributes to the Court's conclusion that cause exists to dismiss this case under section 1112.

*633 Third Assocs.*, No. 91 CIV. 5735 (CSH), 1991 WL 236842, at *2 (S.D.N.Y. Oct. 31, 1991)

("[Section 1111(b)] was not intended as a device for non-recourse creditors to enhance their

position under state law—thereby repudiating their bargain—in advance of any bankruptcy

proceeding that may or may not take place."). To hold otherwise would allow a would-be

petitioner to lift itself up by its own bootstraps "to status of 'holder of a claim' under §

303(b)(1)." *In re Curtis*, 38 B.R. 364, 369 (Bankr. N.D. Okla. 1983).

    2.    <u>Bankruptcy Code Section 102(2)</u>

    The Petitioning Creditors also argue that section 102(2) of the Bankruptcy Code

eliminates any distinction between recourse and nonrecourse claims in bankruptcy, including for

purposes of the eligibility requirements in section 303(b). *See* ¶¶ Opp. 24-32. Section 102(2)

provides that a "claim against the debtor includes [a] claim against property of the debtor." 11

U.S.C. § 102(2). Thus, the Petitioning Creditors contend that they meet the requirement under

section 303(b) of the Bankruptcy Code that they hold a "claim against such person" (*i.e.* against

Taberna) since under section 102(2), a claim against Taberna includes a claim against property

of Taberna (*i.e.* the Collateral).

    The Court construes the requirement in section 303(b) that a petitioning creditor hold a

"claim against such person," by looking to the precise language used by Congress. *See Reiter v.*

*Sonotone Corp.*, 442 U.S. 330 (1979) ("Statutory construction must begin with the language

employed by Congress."). Section 303(b) does not employ the phrase "claim against the debtor"

that is defined in section 102(2). Instead, section 303(b) selectively[16] requires that a petitioning

---

[16] The phrase "against such person" utilized in § 303 is used in only three places within the Bankruptcy Code. The other two other sections which use the term "against such person" are sections 526 and 741. The former authorizes the court to impose an appropriate civil penalty "against such person" who fails to comply with the restrictions on debt relief agencies. The latter provides for definitions specific to stockbroker liquidation.

creditor hold an unsecured claim "against such person" – *i.e.* the actual person or entity that is

the subject of the involuntary petition.  The term "person" is separately defined in section

101(41) of the Bankruptcy Code to include an individual, partnership and corporation or, under

certain circumstances, a government.  11 U.S.C. § 101(41).  Section 101(41)'s definition of a

"person," does *not*, however, include such person's property.  If Congress had intended to allow

commencement of an involuntary case by a creditor holding a claim against a person's property,

as opposed to a claim against *the person*, it just as easily could have used the phrase "claim

against the debtor" (as the statute does elsewhere), and not the more specific "claim against *such*

*person*."

Alternatively, Congress could have added the language "or against such person's

property" to the qualifying language in section 303(b).  Instead, Congress used the narrower

phrase "claim against such person," which is not defined in section 102(2).[17]  As such, the plain

language of section 303(b), when considered together with the definitions set forth in sections

101 and 102 of the Bankruptcy Code, make clear that the phrase "claim against such person"

does not include a "claim against such person's property."

Such a limitation is consistent with the purpose underlying the restrictions contained in

section 303(b):

> The Code's provisions and the rules of procedure governing
> involuntary cases are strict because of the severe nature of
> involuntary relief and the extreme consequences to the debtor in
> being forced into bankruptcy.  On the one hand, involuntary
> petitions are favored because they *can prevent the diminution of*
> *assets by a debtor and provide equality of treatment among*
> *creditors*.  On the other hand, the filing of an involuntary petition
> has the potential of doing great harm the debtor [sic.], including loss

---

[17] The Court also notes that section 102 contains other definitions which are instructive.  The first, set forth in section 102(1), provides that the definition for the phrase "after notice and a hearing" applies not only to that phrase, but also to any "similar phrase."  11 U.S.C. § 102(1).  Section 102(2), by contrast, does *not* provide that its definition of "against the debtor" applies to any similar phrases.  11 U.S.C. § 102(2).

> of the right to use or transfer property, consequences from the denial
> of credit, and even embarrassment.  An involuntary petition is a
> powerful weapon and therefore the Code and Federal Rules of
> Bankruptcy Procedure include numerous requirements and
> restrictions to curtail misuse and to insure that the remedy is sought
> *only in appropriate circumstances.*

*In re Murray*, 543 B.R. 484, 496-97 (Bankr. S.D.N.Y. 2016) (quoting Hon. Joan Feeney, Hon.

Michael Williamson and Michael Stepan, Bankruptcy Law Manual (5th ed. 2014)) (emphasis in

original), *aff'd*, 656 B.R. 527 (S.D.N.Y.), *aff'd*, 900 F.3d 53 (2d Cir. 2018).

The Court is aware of only one prior decision that squarely addressed this definitional

issue; it concluded that a non-recourse creditor is not eligible to be a petitioning creditor under

section 303.  *See In re Green*, No. 06-11761, 2007 WL 1093791, at *8 (Bankr. W.D. Tex. 2007).

In that case, the issue before the Court was whether nonrecourse creditors qualify as holders of

claims "against such person" as used in section 303(b)(1), particularly in light of section 102(2)

of the Bankruptcy Code.  *See id.* at *7.   The court concluded that "[i]t is clear that for a creditor

to be 'counted' under § 303(b)(1) it must hold a claim against the 'person,' *i.e.* the alleged debtor

must be personally liable for the creditor's claim in order for that creditor to be 'counted.'"  *Id.* at

*8.  The court explained that "the primary reason why claims against property were most likely

not included is that holders of those claims have a remedy outside of bankruptcy [by means of a

state court foreclosure proceeding] whereas holders of unsecured claims against the person do

not."  *Id.*; *accord In re Amanat*, 321 B.R. 30, 38 (Bankr. S.D.N.Y. 2005) ("As a leading treatise

concludes, with regard to a partially secured creditor, the amount of its claim for purposes of

being a petitioning creditor is the amount of the unsecured portion of its debt.") (quoting *Collier*

*on Bankruptcy*, ¶ 303.03 (15th ed. 1979)(internal quotations omitted); *In re Tsunis*, 39 B.R. 977,

979 (E.D.N.Y. 1983) (holding that if a creditor's claims "[can] be satisfied in state court then the

creditors would not be permitted to bring a petition for involuntary bankruptcy. If the claims

cannot be satisfied in a state [foreclosure] action, then the creditors remain unsecured and are entitled to bring an action in bankruptcy court").

The Petitioning Creditors nevertheless argue that two cases within this Circuit require a different result. The first case involved an involuntary petition commenced by holders of mechanics' liens, which pursuant to applicable state law, were limited to the debtor's property identified in the lien. *See Carteret Savs. Bank, F.A. v. Nastasi-White, Inc. (In re East-West Assocs.)* 106 B.R. 767, 771 (S.D.N.Y. 1989). In *East-West Associates*, approximately three months after the involuntary petition was granted, a secured lender moved for relief from the automatic stay, to proceed with a foreclosure on the debtor's property, or for dismissal of the involuntary petition. *Id.* at 769. The Bankruptcy Court ultimately required the petitioning creditors to make certain adequate protection payments to the lender and ruled that the lender's motion to dismiss would be granted if the petitioning creditors failed to make the payments. *See id.* On appeal to the District Court, the lender argued that the case should have been dismissed because the holders of the mechanics' liens did not qualify as petitioning creditors under section 303 of the Bankruptcy Code, as they did not hold claims "against the debtor." *Id.* at 770. District Judge Conboy stated that because, under section 102(2) a claim "against the debtor" includes a claim against the debtor's property, "it *seems* that the Petitioning Creditors are eligible under Section 303(b)." *Id.* at 771 (emphasis added).

This Court concludes that the *East-West* case is distinguishable from this case. Although the *East-West Associates* decision contains very little analysis, it appears that the decision was based, at least in part, on the fact that the involuntary petition already had been granted. The District Court was ruling not on whether to enter an order for relief (as here), but on a subsequent motion to dismiss the pending chapter 11 case under section 1112 of the Bankruptcy Code, *id.* at

30

769, pursuant to which a case may be dismissed, *inter alia*, for cause. *See* 11 U.S.C. § 1112. This explains why the Court based its decision on the Code's definition of the phrase "against the debtor" –a phrase that is not used in section 303(b)—and not the section 303 statutory eligibility language which requires that a petitioning creditor hold a claim "against such person." No other court in this Circuit has cited the *East-West Associates* decision for the proposition urged by the Petitioning Creditors.

In the only other case to address the subject in this Circuit, the Bankruptcy Court rejected the Petitioning Creditors argument. *See In re Allen-Main Assocs. L.P.*, 218 B.R. 278 (Bankr. D. Conn. 1998), *aff'd*, 223 B.R. 59 (B.A.P. 2d Cir. 1998). The issue before the Bankruptcy Court in *Allen-Main* was "whether a non-recourse secured creditor may be a sole petitioner in an involuntary Chapter 7 case." *Id.* Unlike section 1111(b), section 102(2) applies in both chapter 11 and chapter 7 cases. In the *Allen-Main Associates* case, the Court focused its analysis on the plain language of section 303(b) and reasoned that because a nonrecourse creditor had agreed to look only to its collateral for the satisfaction of its debt, "the alleged debtor is not personally liable on the note. Without personal liability, there can be no unsecured claim." *Id.* at 279-280. Moreover, the court noted that to the extent that "*East-West Associates* suggest[s] that a non-recourse secured creditor is eligible to act as the sole petitioning creditor under § 303(b), the court rejects the reasoning in [that] decision[]." *Id.* at 280. The Court further explained that "[i]n holding that a non-recourse secured creditor may not act as the sole petitioning creditor under § 303(b), the court notes that for the past one hundred years, U.S. bankruptcy statutes have required creditors filing involuntary petitions to hold unsecured debt." *Id.* On appeal, the Second Circuit Bankruptcy Appellate Panel (the "Panel") upheld the *Allen Main Associates* decision. *CC Britain Equities, L.L.C. v. Allen-Main Assocs. (In re Allen-Main II)*, 223 B.R. 59

(B.A.P. 2d Cir. 1998).  In affirming the Bankruptcy Court's decision, the Panel explained that

the plain language of section 303(b) requires a petitioning creditor to hold a claim against "such

person," and reasoned that a nonrecourse creditor, which has no right to payment from either the

debtor or the debtor's other property, fails to meet the eligibility requirements in a chapter 7 case.

*See id.* at 61—62.  The Court stated that it did not consider the impact of section 1111(b) of the

Bankruptcy Code, which applies only in chapter 11 bankruptcy cases, but noted, in *dicta*, that

with certain exceptions, section 1111(b) does not distinguish between recourse and nonrecourse

claims.  *See id.* at 63.  However, having considered section 102(2) and its legislative history, the

Panel rejected the argument now advanced by the Petitioning Creditors.  *See id.* at 62.

    For these reasons, this Court concludes that because the Petitioning Creditors hold claims

against only the Collateral, and do not hold claims against Taberna, they fail to meet the

requirement under section 303(b) of the Bankruptcy Code.

    3.    Claims of Nonrecourse Creditors

    The Petitioning Creditors next argue that even if they have no *in personam* claims against

Taberna due to the nonrecourse nature of the Notes, they nonetheless hold claims against

Taberna within the meaning of section 303(b)(1).  *See* Opp. ¶¶ 40- 42.   None of the cases cited

by the Petitioning Creditors support this contention.  For example, the Petitioning Creditors

argue that under *Johnson v. Home State Bank*, 501 U.S. 78 (1991), a nonrecourse lender holds a

personal claim against the borrower in bankruptcy.  *See* Opp. ¶¶ 4, 26, 41.  *Johnson* had nothing

to do with eligibility requirements under section 303(b) or with an involuntary bankruptcy case

in any respect.  Rather, *Johnson* concerned a mortgage loan that had been administered in a

borrower's chapter 7 bankruptcy case, where the borrower received a discharge of personal

liability with respect to the loan, while the mortgage lender retained its security interest in the

mortgaged property. 501 U.S. at 80. After the debtor received a discharge with respect to the

mortgage, the holder of the mortgage lien reinstated its foreclosure proceeding, which prompted

the borrower to commence a second bankruptcy case, this time under chapter 13 of the

Bankruptcy Code. In his chapter 13 case, the debtor sought to treat the mortgage holder's lien

against the mortgaged property as a claim to be administered under his chapter 13 plan of

reorganization, and the mortgage lender objected. *Id.* at 80-81. The issue before the court was

whether the mortgage lender's security interest in the borrower's mortgaged property constituted

a claim that could be included in his chapter 13 plan. *Id.* at 80. Noting that the mortgage lender

had a right to payment in the form of the proceeds from a sale of the debtor's mortgaged property

as well as a right to an equitable remedy (foreclosure), the Court concluded that the surviving

mortgage interest constituted a claim against the debtor within the meaning of section 101(5).

*Id.* at 83-84. The Court also noted that since under section 102(2), a claim against a debtor

includes a claim against a debtor's property, the mortgage interest constituted a claim against the

debtor to be administered in the chapter 13 case. *Id.* at 85. While *Johnson* provides that a

security interest in property of a debtor constitutes a claim that may be administered in a chapter

13 case, it does not stand for the proposition that a holder of a security interest under a

nonrecourse loan holds a "claim against such person" as required to qualify as a petitioning

creditor under section 303(b) of the Bankruptcy Code. To construe *Johnson* in such a way

would negate the express requirement of section 303(b)(1) that petitioning creditors hold

"noncontingent, undisputed claims [that] aggregate at least $15,775 *more than the value of any*

*lien on property of the debtor securing such claims* . . ." 11 U.S.C. § 303(b)(1) (emphasis

added). *Johnson* simply stands for the proposition that a secured lender's foreclosure right and

right to sale proceeds constitute a "claim" within the meaning of the Bankruptcy Code.

33

However, *Johnson* does not stand for the proposition that such rights constitute a claim *against the debtor* above the value of its lien on property; *i.e.* an *unsecured claim* within the meaning of section 303(b).

The Petitioning Creditors' reliance on *Midland Funding LLC v. Johnson*, 137 S. Ct. 1407 (2017), is similarly misplaced. *See* Opp. ¶¶ 41. In *Midland Funding*, a party filed a proof of claim for a credit card debt that was time-barred and noted on its proof of claim that the statute of limitations had expired. 137 S. Ct. 1407, 1411 (2017). The claim ultimately was disallowed, and the chapter 13 debtor sued the claimant alleging that the filing of the proof of claim constituted a violation of the Fair Debt Collection Practices Act (the "FDCPA") because it was false, deceptive and misleading, and an unconscionable and unfair means of collecting a debt. *Id.* The Supreme Court held that the claimant's filing of the proof of claim was not actionable under the FDCPA because the Bankruptcy Code's definition of "claim" includes a right to payment, "whether or not such right is . . . disputed" or enforceable, *id.* at 1412 (quoting 11 U.S.C. § 101(5)(A)), and a proof of claim is merely "a statement by the creditor that he or she has a right to payment subject to disallowance." *Id.* at 1413. While *Midland Funding* may stand for the proposition that a disputed and ultimately unenforceable claim still constitutes a claim, section 303(b)(1) explicitly requires that a petitioning creditor hold a claim that is not subject to a *bona fide* dispute. 11 U.S.C. § 303(b). Thus, the Court rejects the Petitioning Creditors argument that based on *Midland Funding* they may hold an as yet unspecified claim against Taberna with respect to the Notes. Even then, the Petitioning Creditors must also establish a *prima facie* case that any such claim, once identified to the Court, is not subject to a *bona fide* dispute and otherwise meets the requirements of section 303. *See Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC),* 330 F.3d 111, 117 (2d Cir. 2003), *abrogated on other grounds by*

34

*Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156 (2d Cir. 2010). Not only have the Petitioning Creditors failed to establish a *prima facie* case that they hold an undisputed claim against Taberna, they have failed even to identify any claim against Taberna. The Court is also not convinced by the cases cited by the Petitioning Creditors construing treatment of nonrecourse claims for tax purposes, as the rationale underlying those decisions reflects policies unique to the Internal Revenue Code, as opposed to the Bankruptcy Code. *See* Opp. ¶ 40.

4.    This Court's Prior Summary Judgment Decision Does Not
      Render Petitioning Creditors Eligible To File An Involuntary Case

The Petitioning Creditors' final argument is that this Court previously found, in connection with the denial of their Motion for Summary Judgment that the Petitioning Creditors do not hold the lien on the Collateral (under the Indenture, the lien is held by the Trustee *for the benefit of the Noteholders*), and therefore the Petitioning Creditors hold unsecured claims for purposes of the eligibility requirements in section 303(b). *See* Opp. ¶¶ 52-62. Specifically, the Petitioning Creditors rely on the language in section 303(b)(1), which provides that the three petitioning creditors must hold claims that "aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims *held by the holders of such claims*." 11 U.S.C. § 303(b)(1) (emphasis added). Thus, the Petitioning Creditors argue that although they are the holders of the PC Note Claims, they are not the holders of the lien, and therefore the value of any lien they hold is zero. As such, they argue that because the PC Note Claims aggregate more than the value of any lien held by the holders of the PC Note Claims, the Petitioning Creditors meet the requirements of section 303(b)(1).

The Court notes initially that the denial of summary judgment has no precedential effect. *Paquin v. Fed. Nat. Mortg. Ass'n*, 20 F. Supp. 2d 94, 96 (D.D.C. 1998), *aff'd sub nom. Paquin v. Fed. Nat. Mortg. Ass'n*, 194 F.3d 174 (D.C. Cir. 1999) ("Moreover, denial of a motion for

summary judgment does not constitute the 'law of the case' because it 'does not purport to decide the factual question, it merely denies the motion because, in the court's then view, there were 'issuable facts.' Such a denial merely postpones decision of any question; it decides none.") (internal citations and quotation marks omitted); *see* 10A Wright & Miller, Federal Practice and Procedure § 2712 (4th ed. 2008) ("[A] denial of summary judgment is not a decision on the merits, it simply is a decision that there is a material factual issue to be tried.").  Moreover, the Petitioning Creditors, at the outset of their argument, rely upon an erroneous premise.  In denying its Motion for Summary Judgment, the Court did not find, as Petitioning Creditors claim, that Petitioning Creditors hold unsecured claims for the purposes of the eligibility requirements under section 303(b).  *See Kramer v. Ayer*, No. 68 CIV. 2652, 1971 WL 308, at *2 (S.D.N.Y. Dec. 6, 1971) ("Since summary judgment was denied there is no 'law of this case.' A denial of summary judgment is not a judgment on the merits."); *see also In re Foxmeyer Corp.*, 286 B.R. 546, 557 (Bankr. D. Del. 2002) ("[A]mple case authority exists for the precisely contrary position that denial of a summary judgment motion does not constitute law of the case.") (collecting cases).  Rather the Court only addressed whether the Petitioning Creditors, as the movant, had established that no genuine dispute as to any material fact exists, and that they were entitled to judgment as a matter of law on the issue of whether they hold unsecured claims against Taberna.  *See* Summary Judgment Decision [ECF No. 133].  In disposing of the Petitioning Creditors' motion for summary judgment, the Court ruled that the Petitioning Creditors failed to establish that no genuine dispute as to any material fact exists and that they were entitled to judgment as a matter of law.  Petitioning Creditors argue in favor of an unnaturally rigid reading of the statute.  Such a reading would yield the absurd result of permitting secured nonrecourse parties to qualify as the petitioning creditors simply because their

liens are held in trust by a third party such as the Indenture Trustee.  Because the Petitioning

Creditors hold secured nonrecourse claims, they do not qualify as petitioning creditors under

section 303(b).

## IV.
## DISMISSAL FOR CAUSE

The Court also concludes, in the exercise of its discretion, that even if the Petitioning

Creditors were eligible under section 303(b), dismissal is appropriate in this case pursuant to

Section 1112 of the Bankruptcy Code and the Second Circuit's recent decision in *Wilk Auslander*

*LLP v. Murray (In re Murray)*, 900 F. 3d 53 (2d Cir. 2018).

Section 1112 authorizes dismissal of a case for cause when it is in the best interest of the

creditors and the estate to do so.  11 U.S.C. § 1112.  Section 1112(b) lists circumstances that

constitute cause to dismiss a case and grants the bankruptcy court broad equitable discretion to

grant relief based upon the facts and circumstances of a particular case.  *Lynch v. Barnard*, No.

17-CV-4190(JS), 2018 WL 4494878, at *4 (E.D.N.Y. Sept. 19, 2018), *appeal docketed*, No. 18-

2934 (2d. Cir. Oct. 03, 2018).  The list of circumstances that justify dismissal for cause specified

in section 1112(b) "is illustrative, not exhaustive." *C-TC 9th Ave. P'ship v. Norton Co.,*

*Maplewood Colonie Common Sch. Dist., Town of Colonie (In re C-TC 9th Ave. P'ship)*, 113 F.3d

1304, 1311 (2d Cir. 1997); *see also id.* at n.5 (quoting H.R. Rep. No. 95–595, at 405–6, *as*

*reprinted in* 1978 U.S.C.C.A.N. 5787, 6363–64) ("The list contained in § 1112(b) is not

exhaustive.  The Court will be able to consider other factors as they arise, and to use its equitable

powers to reach an appropriate result in individual cases.").

The Court may dismiss a case *sua sponte*, after notice and a hearing, under section

1112(b) if there is cause.  *In re Munteanu*, No. 06 CV 6108(ADS), 2007 WL 1987783, at *3

37

(E.D.N.Y. June 28, 2007). ("Although the plain language of Section 1112 states that dismissal is required 'on request of a party in interest,' Courts generally hold that after the 1986 amendments to section 105 of the Bankruptcy Code, the Bankruptcy Court has the authority to dismiss a bankruptcy petition for cause under section 1112(b) on its own motion."); *see also In re C-TC 9th Ave. P'ship*, 113 F.3d at 1310 (holding that the bankruptcy court may dismiss a bad faith filing pursuant to 11 U.S.C. § 1112(b) *sua sponte*); *In re Coram Graphic Arts*, 11 B.R. 641, 644 (Bankr. E.D.N.Y. 1981).

Recently, in *Wilk Auslander LLP v. Murray*, the Second Circuit upheld the District Court's affirmance of the Bankruptcy Court's *sua sponte* dismissal of an involuntary chapter 7 petition, holding that "even if a petition meets the statutory requirements of section 303 . . . a bankruptcy court may dismiss it for cause under section 707(a) after notice and a hearing." 900 F.3d 53, 60. The Second Circuit made clear that this authority is not limited to cases arising under chapter 7; bankruptcy courts also have the authority to dismiss an involuntary case under Chapter 11 for cause, *sua sponte*, after notice and a hearing. *Id.* at n.4.

As the Second Circuit held in *Murray*, cause is a fact-specific inquiry and a variety of factors may be relevant. The court specifically held that "[i]nappropriate use of the Bankruptcy Code may constitute cause to dismiss . . . ." *Id.* at 60. An involuntary chapter 11 is appropriate where the petitioning creditor seeks to guard against other creditors obtaining an unfair and disproportionate share of the alleged debtor's assets. *See In re Bayshore Wire Prod. Corp.*, 209 F.3d 100, 105 (2d Cir. 2000) (citing *In re Better Care, Ltd.*, 97 B.R. 405, 411 (Bankr. N.D. Ill. 1989); *see also In re Luxeyard, Inc.*, 556 B.R. 627, 640 (Bankr. D. Del. 2016) ("[A] creditor may use the device of an involuntary petition when bankruptcy is necessary to assure equal distribution among creditors."). Thus, an involuntary petition that seeks to achieve objectives

38

that benefit all creditors is consistent with the Bankruptcy Code's goal to "secure equal

distribution among creditors." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651,

655 (2006). Specifically, under chapter 11, the Code's objective is to "preserv[e] going concerns

and maximiz[e] property available to satisfy creditors . . . and [to]achieve fundamental fairness

and justice." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012) (collecting cases).

A bankruptcy petition therefore "must seek to create or preserve some value that would

otherwise be lost—*not merely distributed to different a stakeholder*—outside of bankruptcy." *In

re Integrated Telecom Express, Inc.*, 384 F.3d 108, 129 (3d Cir. 2004) (emphasis added); *see

also* S. REP. 95-989, 32-33, 1978 U.S.C.C.A.N. 5787, 5818-19 ("Because the assets of an

insolvent debtor belong equitably to his creditors, the bill permits involuntary cases in order that

creditors may realize on their assets through reorganization as well as through liquidation.").

Accordingly, courts have found cause based on bad faith where a party filed an "involuntary

bankruptcy petition in order to take control of a corporation or its assets." *In re Glob. Energies,

LLC*, 763 F.3d 1341, 1350 (11th Cir. 2014).  While a finding that the filer acted in bad faith is

often invoked as a reason to dismiss for cause, the Court "need not . . . classify misuse of the

Bankruptcy Code as bad faith in order to accept it as cause to dismiss, particularly when, as here,

misuse is one of a number of factors supporting cause to dismiss." *In re Murray*, 900 F.3d at 60.

"The bankruptcy court has this discretion whether dismissal is sought on a basis specified

in the Code, or on bad faith or other unenumerated cause . . . 'A bankruptcy court has discretion

to determine what additional circumstances, not enumerated in the statute, may constitute

cause.'" *In re Murray*, 543 B.R. at  492 (quoting *Clear Blue Water, LLC v. Oyster Bay Mgmt.

Co., LLC*, 476 B.R. 60, 67 (E.D.N.Y. 2012).  Here, the Objecting Parties have alleged bad faith,

and based upon Petitioning Creditor's case in chief, there are certainly facts that could support

such a finding. Nonetheless, Opposing Creditors have not moved for judgment based on bad faith and the Court makes no determination as to whether the Petitioning Creditors have brought this case in bad faith.

The Petitioning Creditors, for their part, allege that their actions were taken in good faith. Specifically, the Petitioning Creditors cite to *In re Zais Investment Grade Limitd VII*, 455 B.R. 839, 849 (Bankr. D.N.J. 2011), in which another bankruptcy court found similar motivations and actions to be consistent with the purpose of the bankruptcy code and of chapter 11. Indeed, Petitioning Creditor's principal (and only fact witness at trial), Vikaram Ghei, freely admitted that he was involved in and carefully followed the *Zais* case. 11/30/17 Tr. 78:8—18; 164:2—25, Adv. Pro. No. 17-01087 ECF No. 17. As explained below however the *Zais* case does not support Petitioning Creditors' request for an entry of an order for relief in this case.

The Court concludes that cause to dismiss exists because no bankruptcy purpose is served by this filing. Moreover, Petitioning Creditors will not suffer any prejudice if the case is dismissed. Indeed, in the Court's view it would be an injustice for the Court to find that the Petitioning Creditors, sophisticated business entities who analyzed and bargained for Taberna's current liquidation scheme, are prejudiced by the contractual terms and conditions they freely sought out and entered. *See In re Murray*, 900 F.3d at 62.

The Court concludes in the exercise of its discretion that the best interests of the (putative) estate and all creditors are best served by dismissal of this case. *See In re Balco Equities Ltd., Inc.*, 312 B.R. 734, 748–49 (Bankr. S.D.N.Y. 2004) (Cause under section 1112(b) "may be found based on unenumerated factors, including . . . failure to deal with creditors fairly even where 'bad faith' is not found"); *see also In re AMC Realty Corp.*, 270 B.R. 132, 147 (Bankr. S.D.N.Y. 2001) (dismissing the chapter 11 case for cause without finding bad faith); *In*

*re Glob. Energies, LLC*, 763 F.3d 1341, 1350 (11th Cir. 2014) (stating that cause exists where a

party files an "involuntary bankruptcy petition in order to take control of a corporation or its

assets").  Specifically, the following facts support this conclusion:

- The alleged debtor is not an operating business and does nothing other than hold securities that generate cash flow to pay noteholders pursuant to the terms of the Indenture. *See* JPO § III Stip. Facts ¶¶1-2, 14; *see TP Management LLC's Answer* [ECF No. 20], Ex. B (Taberna has no employees or operations of its own, and instead contracts with outside parties for all functions); *see* Petitioning Creditor's Statement [ECF No. 2, ¶20]; 11/30/17 Tr. 95:14—97:21, Adv. Pro. No. 17-01087 ECF No. 15.

- By the terms of the Indenture, Taberna is intended to exist only for a finite period of time, investing cash and paying out to investors pursuant to the notes, which under the Indenture have a maturity date of May 5, 2036. JPO § III Stip. Facts ¶5.; JX 1 INDENTURE pp. 9—14.

- The alleged debtor does not need, or want, a discharge. *See* TP Management LLC's Answer [ECF No. 20], ¶5 ("As a result of being a CDO in run-off, the alleged debtor has no business to 'rehabilitate' or to bestow with a 'fresh start' under chapter 11."); *see also* Taberna Preferred Funding IV, LTD's Answer [ECF No. 84].

- No assets would be lost or dissipated if the bankruptcy case were dismissed. *See* JX 49.

- Petitioning Creditors are being paid pursuant to the Indenture. *See* JPO § III Stip. Facts ¶¶12, 22.

- Pursuant to the terms of the Indenture, the Petitioning Creditors have adequate remedies for any grievances under nonbankruptcy law. *See, e.g.*, JX 1 INDENTURE pp. 173—190 (the Indenture provides for bargained-for contractual remedies); *see also* 11/30/17 Tr. 97:11—24, Adv. Pro. No. 17-01087 ECF No. 15; *see also* 10/18/18 Tr. 16:9—6, ECF No. 161.

- Under the terms of the Indenture, Petitioning Creditors' Notes are fully secured.

- The Petitioning Creditors previously engaged in unsuccessful serial efforts to liquidate the collateral. *See, e.g.*, Petitioning Creditor's Statement [ECF No. 2], ¶39.

- In tandem with filing this involuntary petition, each Petitioning Creditor waived its right to benefit from security interests in any assets of the alleged debtor solely on account of their ownership interest in the Class A-2 Notes up to, but not to exceed, the amount of $5,259.00, to collectively achieve the section 303 statutory requirement of claims aggregating $1,5775. JPO § III Stip. Facts ¶57.

- One day after filing the involuntary petition, Petitioning Creditors moved to terminate the putative debtor's exclusivity period to file a plan, *see* ECF No. 1-3, thereby seeking authorization to file their own plan, having circulated pre-filing, but failing to obtain other creditors consent to, a proposed plan that would liquidate the collateral.

- The record evidence makes clear that Petitioning Creditors are seeking to liquidate the collateral solely for their benefit, and at the expense of other Note holders. *See* email from Joseph Furmari to Vikaran Ghei [JX 40]; *see also* Notice of Filing of Certain Unredacted Exhibits to Affidavit of H. Peter Haveles, Jr. Pursuant to Order Amending Prior Order Granting Ex Parte Motion to File Documents Under Seal [ECF No. 82], Exh. D, ¶¶ 2.1—3.19 (noting that junior noteholders are impaired classes deemed to reject the plan.); 11 U.S.C. ¶ 1126(g) ("Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.").

- Petitioning Creditors purchased the notes in Taberna fully aware that it had defaulted (several years earlier). *see, e.g.*, 11/29/18 Tr. 153:14—23, Adv. Pro. No. 17-01087 ECF No. 16.

- After these earlier attempts to liquidate the collateral failed, two months before filing this involuntary petition, Petitioning Creditors paid 91.1875 percent on the outstanding principal amount to purchase the remaining Class A notes, thereby giving Petitioning Creditors a controlling share of Class A notes. A mere three weeks earlier Petitioning Creditors' had offered to buy at 76 percent of the outstanding principal. 11/30/17 Tr. 103:18—23, Adv. Pro. No. 17-01087 ECF No. 17.

- Petitioning Creditors' principal, Vikaran Ghei, relying on his experience and expertise with respect to complex financial instruments such as CDOs, the workings of the Bankruptcy Code, and the *Zais* case, endeavored to follow and pattern his initiatives here after those he believed led to the positive result in *Zais*. *See* 11/28/17 Tr. 47:24—50:24, Adv. Pro. No. 17-01087 ECF No. 15; *see also* 11/29/17 Tr. 177:1—17, Adv. Pro. No. 17-01087 ECF No. 16; 11/30/17 Tr. 108:2—110:24, Adv. Pro. No. 17-01087 ECF No. 17; JPO § III Stip. Fact ¶ 1; PC Stmt. ¶ 6; JPO § III Stip. Fact ¶ 35; *see* [email from Thomas Ji to Vik Ghei, JX 66]; *See* Consent Solicitation [JX 66]; *see also* JPO § III Stip. Fact ¶ 35.

- Despite Petitioning Creditors Rule 1003 affidavit, [ECF No. 1 Exh. 2] the Court finds, based on the evidence and testimony offered at trial, that Petitioning Creditors purchased the defaulted notes with an eye towards commencing this involuntary petition. *See* JX 84; 11/30/2017 Tr. 115:20—119:202, Adv. Pro. No. 17-01087 ECF No. 17 (Petitioning Creditors' principal testifying that they engaged bankruptcy counsel prior to purchasing the notes); *see also* JPO § III Stip. Facts ¶ 33; *Cf* Federal Rule of Bankruptcy Procedure 1003 ("An entity that has transferred or acquired a claim for the purpose of commencing a case for

liquidation under chapter 7 or reorganization under chapter 11 shall not be a qualified petitioner.").

The foregoing facts, taken as a whole, readily support the conclusion that under the reasoning of *Murray* this case should be dismissed for cause pursuant to 11 U.S.C. § 1112(b). In making this determination the Court considers the purpose and goals of the Bankruptcy Code. *See In re Murray* 900 F.3d at 59. "The legislative purpose of Chapter 11 is the speedy rehabilitation of financially troubled businesses." *In re 312 W. 91st St. Co., Inc.*, 35 B.R. 346, 347 (Bankr. S.D.N.Y. 1983); *see also In re Murray*, 543 B.R. at 495 ("Through orderly and centralized liquidation or through reorganization or rehabilitation, creditors of equal priority receive ratable and equitable distributions designed to serve 'the prime bankruptcy policy of equality of distribution among creditors of the debtor.'") (quoting 1 *Collier on Bankruptcy* (16th ed. 2015) ¶ 1.01[1]); *In re Metrogate, LLC*, No. 15-12593 (KJC), 2016 WL 3150177, at *7 (Bankr. D. Del. May 26, 2016) ("The purpose of requiring at least three creditors to launch an involuntary case is to necessitate some joint effort between creditors.")(internal quotation marks and citation omitted); *see also* David A. Skeel, Jr., *Debt's Dominion: A History of Bankruptcy Law in America* at 42 (2001) ("[O]nly with involuntary bankruptcy, [commercial groups and their advocates] insisted, would creditors be assured a fair share of debtors' assets.").

It is undisputed that Taberna is not an operating business, and there is therefore no rehabilitative objective that can be served by allowing a bankruptcy case to proceed. *See In re Murray* 900 F.3d at 59*; see also In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1308 (holding that the "primary purpose of Chapter 11 is to enable businesses to reorganize and emerge from bankruptcy as *operating enterprises*") (emphasis added). Furthermore, the fact that the Petitioning Creditors proposed a liquidating plan, *see* Notice of Filing of Certain Unredacted Exhibits to Affidavit of H. Peter Haveles, Jr. Pursuant to Order Amending Prior Order Granting

Ex Parte Motion to File Documents Under Seal [ECF No. 82], Exh. D, strongly suggests that the

Petitioning Creditors elected Chapter 11, rather than Chapter 7, solely in an attempt to obtain the

benefits of Section 1111(b) which, in turn, allowed them to make a colorable (albeit incorrect

and meritless) argument regarding their eligibility to commence an involuntary case.

There is, however, no need for bankruptcy protection here since the Taberna Indenture

independently establishes the parties' agreements as to liquidation.  JX 1, INDENTURE § 11.1.

The Petitioning Creditors' stated goal, which they were unable to achieve through a series of

earlier initiatives, is to rewrite the terms of the Indenture agreement, thereby enabling Petitioning

Creditors to alter Taberna's governance structure and increase its disclosures, with the ultimate

goal of forcing an accelerated liquidation—not a reorganization. JX 111; JX 113, 2; *see* 11/30/18

Tr. 15:6—12, Adv. Pro. No. 17-01087 ECF No. 17.  This is unnecessary (and indeed,

inappropriate) since Taberna is a static pool investment vehicle, intended to exist for only a

limited time.  In contemplation of the possibility that Taberna would lack the funds necessary to

pay timely interest or principal, all noteholders (including Petitioning Creditors) expressly agreed

to terms for how the indenture trustee will manage the remaining portfolio and how losses will

be distributed among the noteholders.  Here, the alleged debtor faces no involuntary creditors

and the rules for liquidating this single purpose, single use entity were set forth by contract.

Everyone, including Petitioning Creditors who purchased the already defaulted notes, agreed to

those rules.

The Court does not view these facts in isolation but considers them within the context of

the entire case.  Here, Petitioning Creditors took intricate—choreographed—steps to

manufacture eligibility to file an involuntary case.  For example, the only reasonable inference to

draw from Petitioning Creditors' waiver [ECF No. 1-3] is that Petitioning Creditors waived their

rights to benefit from any security interest up to the statutory eligibility filing requirement in an attempt to artificially create eligibility to file an involuntary petition under section 303 as partially unsecured creditors.  However, the cumulative actions by the Petitioning Creditors including knowingly purchasing a controlling stake of class A notes after previous failed attempts to liquidate the collateral, drafting a liquidating plan for the exclusive benefit of class A noteholders, filing the involuntary petition under chapter 11 (rather than under chapter 7) to invoke the benefits of section 1111(b), and waiving their right to benefit from any security interest up to the statutory eligibility filing requirement, makes clear to the Court that Petitioning Creditors intended to abuse the bankruptcy code and bankruptcy process.  With the benefit of experienced counsel, *see* 10/18/18 Tr. 25:23—25, [ECF No. 161], Mr. Ghei—himself a sophisticated investor, knowledgeable both with respect to complex financial transactions including CDOs and the workings of Bankruptcy Code, *see* 11/28/17 Tr. 47:24—50:24, Adv. Pro. No. 17-01087 ECF No. 15; *see also* 11/29/17 Tr. 177:1—17, Adv. Pro. No. 17-01087 ECF No. 16—orchestrated a process  whereby the Petitioning Creditors cited selective Code provisions in the hope that it would enable them to effectuate an accelerated liquidation of an already self-liquidating securitization vehicle, for their own benefit at the expense of the larger creditor community.

As noted, this filing comes on the heels of Petitioning Creditors' other unsuccessful attempts to initiate the liquidation of the collateral by means of, *inter alia*, a tender offer and a consent solicitation.  Petitioning Creditors are sophisticated parties who carefully, and after much study, knowingly and voluntarily bought notes in the secondary market for an already defaulted CDO.  *See* 11/28/17 Tr. 150:10—158:11, Adv. Pro. No. 17-01087 ECF No. 15.  Petitioning Creditors knowingly agreed to the terms of the underlying securitization documents when they

purchased the notes at issue. Under sections 5.4, 5.5, 5.8, 5.13 and 11.1 of the Indenture, the

Petitioning Creditors agreed to prohibit the A-1 Noteholders (*i.e.* themselves) from forcing a

liquidation of the collateral, contractually signed on to a no-action clause in order to prohibit a

single bondholder (or a small group of bondholders) from bringing a suit against the issuer which

would be contrary to the collective economic interests of the other bondholders, and agreed that

in the event of a default a *comprehensive priority of payments* be applied. JX 1, INDENTURE at

pp. 54—178. The Petitioning Creditors seek bankruptcy solely as a means to alter the terms of a

contract they freely entered.

The Court concludes that it "is clear from the totality of circumstances that this is not the

type of case for which Congress enacted Chapter 11 of the Bankruptcy Code."[18] *In re 312 W.

91st St. Co., Inc.*, 35 B.R. at 347. There is no genuine attempt to reorganize the putative debtor

so that it can reemerge from bankruptcy as a viable on-going business. Rather, this case is a last-

ditch effort by a senior sophisticated noteholder to further its personal, tactical and pecuniary

aims and to coerce a redemption of its notes *to the detriment of junior creditors*. *See* 11/29/17

Tr. 31:2—32:7, Adv. Pro. No. 17-01087 ECF No. 16 (indicating that Anchorage believed the

value of the notes could increase dramatically within a couple of years). This type of scheme

conflicts with the goal of Bankruptcy Code, which is to afford a debtor an opportunity to

continue business, preserve equity, and provide a collective remedy, goals which serve to protect

the interests of all creditors equally and fairly. While liquidation is an appropriate purpose of a

---

[18] In response to this Court's Order to Show Cause, ECF No. 153, the Petitioning Creditors, through counsel, argued for the first time that section 1123(a)(5)(F) permits cancelling or modifying an indenture. 10/18/18 Tr. 25:23—27:11. Therefore, the Petitioning Creditors argue, there is a valid purpose here and the Court should enter an order for relief. As an initial matter, under the Code the term 'indenture' has a specific meaning. The Petitioning Creditors have not the Petitioning Creditors have not established that the Indenture here falls within the meaning of the term 'indenture' as used in section 1123(a)(5)(F), defined in section 101(28). Second, this argument puts the cart before the horse. Section 1123(a) provides a list of the tools one may use to implement a plan. A bankruptcy case, let alone a plan, may only utilize these tools after the Court determines that the underlying case can properly be maintained consistent with the goals of the Code.

chapter 11 case, it cannot be used to frustrate equitable treatment of all creditors. *See In re Murray*, 543 B.R. at 486 ("Bankruptcy was created as a *collective remedy,* to achieve *pari passu* distribution amongst creditors . . . ."); *see also Travelers Ins. Co. v. 633 Third Assocs.*, No. 91 CIV. 5735 (CSH), 1991 WL 236842, at *2 (S.D.N.Y. Oct. 31, 1991) (stating that Congress did not intend for section 1111(b) of the Bankruptcy Code to be invoked by parties as a way to repudiate their bargain in order to enhance their position in advance of a possible bankruptcy); *In re Luxeyard, Inc.*, 556 B.R. 627, 640–41 (Bankr. D. Del. 2016) ("[I]t is proper to file an involuntary petition to protect against other creditors obtaining a disproportionate share of the debtor's assets. Conversely, it is an improper use of the bankruptcy system to file an involuntary petition to obtain a disproportionate advantage for a petitioner's own position."); *id.* at 641 (listing examples of disproportionate advantages which include, *inter alia*, filing in order to change corporate control.).

The Court is also convinced that if the Petitioning Creditor's tactics were permitted and rewarded with an entry of an order for relief, this would create significant uncertainty across the capital markets. *See* Brief for the Structured Finance Industry Group, Inc. as Amicus Curiae Supporting Objecting Parties at 8 [ECF No. 97]. As noted in *In re Zais Investment Grade Limitd VII*, a case heavily relied upon by Petitioning Creditors, and as conceded by Petitioning Creditors at trial [11/28/17 Tr. 157:7—25, Adv. Pro. No. 17-01087 ECF No. 15], "CDO's are designed to avoid bankruptcy." 455 B.R. at 847.

Rather than support Petitioning Creditors request for entry of an order for relief here, the Court concludes that the *Zais* case is legally and factually distinguishable from this case. *In re Zais*, 455 B.R. at 839. Most significantly, in *Zais* the debtor and the other non-petitioning creditors did not oppose the involuntary bankruptcy filing. *Id.* at 846 (the parties "failed to

47

contest the petition and the order for relief was entered by default").  The noteholders in *Zais*

moved to dismiss on grounds unrelated to § 330 eligibility *after* the court had entered an order

for relief.  In short, the debtor in *Zais* took no position with respect to whether the case should

proceed in the bankruptcy court, *Id.* at 847, whereas here the putative debtor asks that the Court

to dismiss this case.  *See* ECF No. 20; ECF No. 32.  Indeed, Mr. Ghei testified that he would not

have filed this case if he knew that the putative debtor would oppose an order for relief.

11/28/2017 Tr. 84:15—23, Adv. Pro. No. 17-01087 ECF No. 16.  The *Zais* court denied the

junior noteholders' motion to dismiss and held, on the differing facts before it, that the movants

had failed to demonstrate that the involuntary petition was brought in bad faith.  *In re Zais*, 455

B.R. at 848.

    The *Zais* case does not mandate entry of an order for relief here.  As an initial matter, the

facts established at trial support the Court's conclusion that Petitioning Creditors have, in a very

methodical and deliberate process, set out to force an accelerated liquidation of Taberna:

- Petitioning Creditors retained adept bankruptcy counsel prior to Petitioning Creditor's failed attempts to liquidate the collateral outside of bankruptcy.

- Mr. Ghei candidly admitted at trial that he patterned his behavior with respect to Taberna after what he believed were the initiatives that led to denial of the motion to dismiss in *Zais*, a case in which he was involved and carefully followed. *See, e.g.*, 11/28/2017 Tr. 158-19, Adv. Pro. No. 17-01087 ECF No. 15.

- After Petitioning Creditor's failed attempts to liquidate the collateral outside of bankruptcy, Petitioning Creditors, in April 2017, purchased additional defaulted notes which gave them a majority stake of the Class A Notes.  11/30/17 Tr. 103:14—23, Adv. Pro. No. 17-01087 ECF No. 17.

- Immediately after Petitioning Creditor's April 2017 Note purchases, Petitioning Creditors, and their bankruptcy counsel, formally expanded the scope of counsel's retention to include a bankruptcy filing. *Compare* JPO § III Stip. Fact ¶ 33 *with* JPO § III Stip. Fact ¶ 44.

- In their motion to terminate putative debtor's exclusivity—filed the day after they commenced this case, Petitioning Creditors tout the fact that they own enough notes to deliver a class that will vote for their proposed plan (thereby ensuring liquidation).

The court in *Zais* found that the case was brought in good faith and for a proper purpose because the petitioning creditors desired to realize the greatest present value for themselves without negatively impacting junior creditors who had no prospect of recovery under the status quo. *Id.* at 849. Here, by contrast, Mr. Ghei conceded that junior creditors are not necessarily out of the money outside of bankruptcy. 11/29/18 Tr. 161:19—24, Adv. Pro. No. 17-01087 ECF No. 16. Yet, in direct contradiction of a basic goal of the bankruptcy code, the Petitioning Creditor's case would increase their recovery at the expense of the junior noteholders. *See* JPO § III Stip. Fact ¶ 22; *Compare* JPO § III Stip. Fact ¶¶ 10-12 *with* Notice of Filing of Certain Unredacted Exhibits to Affidavit of H. Peter Haveles, Jr. Pursuant to Order Amending Prior Order Granting Ex Parte Motion to File Documents Under Seal [ECF No. 82], Exh. D, ¶¶ 2.1—3.19. This distinction is critical and dispositive. Significantly, Anchorage, the Petitioning Creditor in *Zais*, is also a Taberna noteholder and although it reportedly indicated it would support Petitioning Creditor's liquidation efforts, it did not file or join the involuntary petition here and refused to be "on the front line" in connection with this case. 11/29/17 Tr. 31:20— 35:1, Adv. Pro. No. 17-01087 ECF No. 16.

Not only is this involuntary petition fundamentally at odds with the purpose of securitization vehicles, but the Court concludes it also violates the spirit and purpose of the Bankruptcy Code. "An involuntary petition is powerful weapon and therefore the Code and Federal Rules of Bankruptcy Procedure include numerous requirements and restrictions to curtail misuse and to insure that the remedy is sought only in appropriate circumstances." *In re Murray*, 543 B.R. at 497. If the Court allowed this case to continue, allowing a party to force a CDO into bankruptcy at the expense of all noteholders other than the Petitioning Creditors, the Court would encourage other parties put to disregard bargained-for contractual remedies in an

49

Indenture and pursue bankruptcy as a way to redefine the terms of the contracts they freely entered. *See* 11/28/2017 Tr. 158-19, Adv. Pro. No. 17-01087 ECF No. 15 (Petitioning Creditor's principal Mr. Ghei explaining that his understanding of the *Zais* case helped to form the basis for bringing this involuntary petition) ("I think [I] would be negligent for any potential investor in a defaulted CDO not to consider [an involuntary petition] after the *Zais* case in 2011 where that CDO was reorganized through a bankruptcy."). Such a result is antithetical to the goals of the bankruptcy system and to the public interest. "Were we to ignore those interests, we would likely see an increase of new bankruptcy filings in cases that are more appropriately handled in [other forums]." *In re Murray*, 900 F.3d at 63.

For the foregoing reasons, the Court concludes in the exercise of its discretion that, even if the Petitioning Creditors met the eligibility requirements under section 303, cause exists to dismiss this case pursuant to section 1112(b) of the Bankruptcy Code.

## CONCLUSION

For the reasons set forth above, the Court finds and concludes that the Petitioning Creditors have failed to establish a *prima facie* case that they hold claims against Taberna. The PC Note Claims are nonrecourse claims under the Indenture and the PC Note Claims are limited to the Collateral. The Objecting Parties are therefore entitled to judgment on partial findings that the Petitioning Creditors do not qualify as petitioning creditors under section 303(b) of the Bankruptcy Code. The Court has considered the Petitioning Creditors' remaining arguments, and to the extent not specifically addressed herein, concludes that they lack merit.

In the alternative, the Court in the exercise of its discretion, concludes this involuntary case should be dismissed for cause pursuant to 11 U.S.C. § 1112(b).

As a result of this decision, the Alleged Debtor's interpleader complaint is now moot, *see*

Adv. Pro. No. 17-1087(mkv), and Adversary Proceeding 17-1087 is **DISMISSED.**

The parties are directed to settle a judgment on notice.


Dated:    New York, New York
          November 8, 2018

                                   *s/ Mary Kay Vyskocil*
                                   Honorable Mary Kay Vyskocil
                                   United States Bankruptcy Judge